Phil L. HANSEN, Plaintiff
and Appellant,

v.

SALT LAKE COUNTY, a political
subdivision of the State of Utah,
Defendant and Appellee.

No. 21024.

Supreme Court of Utah.

June 15, 1990.

Gregory B. Wall, Salt Lake City, for plaintiff and appellant.

Ernest W. Jones, Salt Lake City, for defendant and appellee.

DURHAM, Justice:

Plaintiff Phil L. Hansen filed suit against defendant Salt Lake County alleging that the County damaged or destroyed various improvements Hansen made to his property near the Big Cottonwood Canyon streambed. The County admitted that it had removed two bridges and various materials from the streambed during implementation of its flood control program but moved to dismiss, claiming immunity under the Utah Governmental Immunity Act,

Utah Code Ann. §§ 63–30–1 to –38 (1989), and that no cause of action could be maintained under the inverse condemnation section of the Utah Constitution. The trial court granted the County's motions to dismiss, and Hansen appealed. We reverse.

Hansen owns property adjacent to the Big Cottonwood Canyon stream. He alleged in his complaint that he had made various improvements to both the streambed and the property. He further alleged that beginning sometime in May 1984, the County, while engaged in altering and improving the streambed as part of its flood control program, intentionally or negligently damaged or destroyed a steel-beamed automobile bridge, a steel-beamed footbridge, a paved driveway, landscaping, and reinforcements to the streambed and banks. In January 1985, Hansen served a written notice of claim for damages upon the County pursuant to Utah Code Ann. §§ 17–15–10 (1987), 63–30–11, and 63–30–13 (1989).[1] These sections provide generally for the time limitations, content, form, and manner of presentation for claims against the County. The County denied the claim in March 1985, and Hansen filed suit on May 14, 1985, in the Third Judicial District Court of Utah. In his original complaint, Hansen claimed that he sustained damage as a direct and proximate result of the intentional and negligent acts of the County. He further claimed that any immunity from suit conferred on the County was waived under Utah Code Ann. § 63–30–10(1) (1989), which provides that "[i]mmunity from suit of all governmental

---

1. Section 17–15–10 in pertinent part provides: "Every claim against the county must be presented to the county auditor within a year after [it] accrue[s]."

Section 63–30–11 in pertinent part provides:
   (2) Any person having a claim for injury against a governmental entity, or against an employee for an act or omission occurring during the performance of his duties, within the scope of employment, or under color of authority shall file a written notice of claim with the entity before maintaining an action. . . .
   (3)(a) The notice of claim shall set forth:
   (i) a brief statement of the facts;
   (ii) the nature of the claim asserted; and
   (iii) the damages incurred by the claimant so far as they are known.

   (b) The notice of claim shall be signed by the person making the claim or that person's agent, attorney, parent, or legal guardian, and shall be directed and delivered to the responsible governmental entity according to the requirements of Section 63–30–12 or 63–30–13.
Section 63–30–13 in pertinent part provides:
   A claim against a political subdivision, or against its employee for an act or omission occurring during the performance of his duties, within the scope of employment, or under color of authority, is barred unless notice of claim is filed with the governing body of the political subdivision within one year after the claim arises. . . .

entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment" unless the injury arises out of one of the activities listed in the statute as an exception to the waiver. Utah Code Ann. § 63–30–10(1)(a) through (m) (1989).[2]

The following September, Hansen filed an amended complaint, adding an inverse condemnation claim based upon article I, section 22 of the Utah Constitution.[3] He also alleged that in addition to waiving immunity under section 63–30–10, the County waived immunity under Utah Code Ann. § 63–30–6 (1989), which reads:

Immunity from suit of all governmental entities is waived for the recovery of any property real or personal or for the possession thereof or to quiet title thereto, or to foreclose mortgages or other liens thereon or to determine any adverse claim thereon, or secure any adjudication touching any mortgage or other lien said entity may have or claim on the property involved.

The County responded by filing motions to dismiss each of Hansen's claims. The trial court granted the first motion on September 25, 1985, and the second on November 11, 1985. The first order of dismissal stated only, "Defendant's motion to dismiss as to the first cause of action is granted." The second order of dismissal stated that article I, section 22 of the Utah Constitution did not create a cause of action. Hansen appealed, and the case is now before us.

One ground for the County's first motion to dismiss was Hansen's failure to comply with Utah Code Ann. § 63–30–19 (1989), which provides:

At the time of filing the action the plaintiff shall file an undertaking in a sum fixed by the court, but in no case

less than the sum of $300, conditioned upon payment by the plaintiff of taxable costs incurred by the governmental entity in the action if the plaintiff fails to prosecute the action or fails to recover judgment.[4]

It is not clear on what ground the trial court granted the County's first motion to dismiss, because the undertaking issue was only part of the County's objection, the other argument being that under sections 63–30–3 and –10(1)(a), the County was immune from suit.[5] Failure to pay the undertaking is an affirmative defense not properly raised in a rule 12(b) motion to dismiss, see Utah R.Civ.P. 8(c), 12(b), although it may be appropriate to raise the issue by a motion analogous to one made under rule 12(k).[6] Dismissal based on failure to file the undertaking should be without prejudice. In contrast to other procedural requirements of the Governmental Immunity Act, failure to comply with section 63–30–19 does not bar a suit. Cf. Utah Code Ann. § 63–30–13 (1989). The policy of discouraging nuisance suits that supports the undertaking requirement is the same as that supporting the cost bond that can be required of nonresident plaintiffs under rule 12(j) of the Utah Rules of Civil Procedure. Our cases hold that dismissal for failure to file such a bond is without prejudice. See, e.g., Bunting Tractor Co. v. Emmett D. Ford Contractors, Inc., 2 Utah 2d 275, 278, 272 P.2d 191, 192–93 (1954). We therefore assume that Hansen's first cause of action was dismissed based on immunity.

### I. GOVERNMENTAL IMMUNITY

*A. Scope of Utah Code Ann. § 63–30–3: Grant of Immunity*

The primary defense of the state and its political subdivisions against being sued is

---

**2.** Flood control is not a specifically excepted activity. See further discussion below.

**3.** "Private property shall not be taken or damaged for public use without just compensation."

**4.** The record does not disclose whether the trial court initially failed to fix an amount for an undertaking or Hansen neglected to pay it.

**5.** In the case of motions to dismiss based on multiple grounds, Utah Rule of Civil Procedure

52(a), as of January 1, 1987, requires the trial court to issue a brief written statement of the grounds upon which such motions are granted.

**6.** A defendant in a suit by a nonresident plaintiff may move for dismissal under rule 12(k) of the Utah Rules of Civil Procedure if the plaintiff has failed to timely post a bond required under rule 12(j).

contained in Utah Code Ann. § 63–30–3 (1989), which reads:

> *Except as may be otherwise provided in this chapter*, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility, and from an approved medical, nursing, or other professional health care clinical training program conducted in either public or private facilities.

> *The management of flood waters and other natural disasters and the construction, repair, and operation of flood and storm systems by governmental entities are considered to be governmental functions, and governmental entities and their officers and employees are immune from suit for any injury or damage resulting from those activities.*

(Emphasis added).

■ Hansen claims that section 63–30–3 does not exempt the County from liability in this case and that, even if it did, any immunity conferred by this section is waived under section 63–30–10(1). Hansen's first point is that the County's actions did not constitute "management of flood waters." Hansen also argues that section 63–30–3 should not apply because Big Cottonwood Creek is not a flood or storm system as contemplated by the statute.

We need not consider the scope of the phrase "management of flood waters" because section 63–30–3 also confers immunity for "the construction, repair, and operation of flood and storm systems" by governmental entities. Hansen acknowledges that the property damage occurred while the County was altering and improving the Big Cottonwood Canyon streambed as part of its flood control program. Hansen's argument that the streambed is a "naturally existing water carrying system" and thus cannot be a "flood or storm system" as

contemplated by the statute is flawed. The Utah Governmental Immunity Act does not define the terms "flood or storm system," but chapter 8 of title 17 authorizes counties to construct flood control projects, and Utah Code Ann. § 17–8–5.5 (1987) specifically authorizes boards of county commissioners "to provide by ordinance for the protection and use of flood channels [and to] establish by ordinance the boundaries of these flood channels...."[7] Salt Lake County Code of Ordinances § 17.08.040.A.10 (1987) includes Big Cottonwood Creek as "part of [Salt Lake County's] storm drainage and flood control system." We conclude that section 63–30–3 of the Utah Governmental Immunity Act applies in this case.

■ The more difficult question raised by the parties is whether the application of section 63–30–3 confers absolute or qualified immunity on the County. The first of the two paragraphs in this section contains a general grant of immunity to governmental entities for the exercise of governmental functions, but begins by subjecting that immunity to exceptions elsewhere in the Act. Following this grant, various governmentally operated health care activities are listed for which governmental entities are also immune from suit.[8] The second paragraph defines flood control activities as governmental functions and reiterates the grant of immunity for those activities. The question is whether the grant of immunity for flood control activities mentioned in the second paragraph is subject to the exceptions mentioned in the first paragraph of section 63–30–3. For the following reasons, we conclude that it is.

■ When interpreting an ambiguous statute, we first try to discover the underlying intent of the legislature, guided by the meaning and purpose of the statute as a whole and the legislative history. *See, e.g., Mountain States Tel. & Tel. Co. v. Payne*, 782 P.2d 464, 466 (Utah 1989);

---

7. Utah Code Ann. § 17–8–5 (1987) makes clear that these flood channels include "natural channels" as well as "new[ly constructed] channels, storm sewers, ... drains [and] buried conduits."

8. There is no requirement that these health care activities be governmental functions for immunity to apply. See further discussion below.

*Crawford v. Tilley,* 780 P.2d 1248, 1251 (Utah 1989).

Before the Utah Governmental Immunity Act was passed in 1965, Utah adhered to the common law doctrine of sovereign immunity. *See, e.g.,* Note, *The Utah Governmental Immunity Act: An Analysis,* 1967 Utah L.Rev. 120. Section 63–30–3, as enacted in 1965, read:

> Section 3. General Immunity in Exercise of Governmental Functions.
>
> Except as may be otherwise provided in this act, all govermental entities shall be immune from suit for any injury which may result from the activities of said entities wherein said entity is engaged in the exercise and discharge of a governmental function.

1965 Utah Laws ch. 139, § 3, at 391.

At the time of enactment and in its present form, the Act had and continues to have a definite structure. Section 1 named the Act, section 2 provided definitions, section 3 granted qualified immunity (i.e., immunity subject to exceptions), section 4 construed the effect of immunity and its qualifications, sections 5 through 10 qualified the immunity granted in section 3 (i.e., waived immunity under various circumstances with some specific reservations), section 11 authorized relief, and sections 12 through 37 set forth procedural and jurisdictional requirements, along with the tax and insurance provisions to allow governmental entities to pay damages. *Compare* 1965 Utah Laws ch. 139, §§ 1, 2, 3, 4, 5 through 10, 11, 12 through 37, at 390–97

*with* Utah Code Ann. §§ 63–30–1, –2, –3, –4, –5 through –10.5, –11, and –12 through –38 (1989). Nowhere in section 3, or anywhere else in the Act, was there any specific grant of absolute immunity. Absolute immunity existed only for those classes of claims not the subject of any waiver.[9] That is, the Act was structured such that immunity was *granted generally* and *waived* (and retained by exception to waiver) *specifically.*

Defendant argues that the language "and governmental entities and their officers and employees are immune from suit for any injury or damage resulting from [flood control] activities," which follows the classification of flood control activities as governmental functions in the second paragraph of section 63–30–3, is a *specific grant* of absolute immunity for those activities. This conclusion belies the logic and structure of the Act as a whole and the limited legislative history surrounding the amendment adding the paragraph on flood control to section 63–30–3.

A review of the evolution of section 63–30–3 will put the 1984 amendment into perspective. Originally this section immunized only the "exercise and discharge of a governmental function." Utah Code Ann. § 63–30–3 (Supp. 1967). The term "governmental function" was not defined by the Act until 1987. This term is a term of art long in use by the courts to define those activities of governmental entities to which common law sovereign immunity applied,

---

9. Activities that are the subject of an exception to a waiver do not actually enjoy absolute immunity. They are still qualified by other waivers that do not have the same exception. For example, provision of emergency medical care by a governmental entity (a governmental function under the current Act) is an activity excepted from the waiver of immunity for negligent operation of motor vehicles, Utah Code Ann. § 63–30–7 (1989), and from the waiver of immunity for negligent acts of governmental entities' employees, Utah Code Ann. § 63–30–10(1)(*l*)(i) (1989). The immunity is not absolute, however, because the waivers of immunity for actions arising out of contractual obligations, Utah Code Ann. § 63–30–5 (1989), actions involving real or personal property, Utah Code Ann. § 63–30–6 (1989), actions involving dangerous conditions on roadways,

Utah Code Ann. § 63–30–8 (1989), actions involving dangerous public structures, Utah Code Ann. § 63–30–9 (1989), and actions for inverse condemnation, Utah Code Ann. § 63–30–10.5 (1989), all remain applicable to actions arising out of the provision of emergency medical services because these other waivers do not specifically except such activities from their application. So if a plaintiff were injured in an accident while being transported in a political subdivision's ambulance, her negligence claim against the ambulance driver and his employer may be barred, but she might still have a cause of action based on contract or based on a dangerous condition on a public roadway that contributed to the cause of the accident. Because a waiver in one section applies to an exception in another section, true absolute immunity exists only for activities not the subject of any waiver.

4

as opposed to "proprietary functions" of those entities, to which immunity did not apply. *See, e.g., Standiford v. Salt Lake City Corp.,* 605 P.2d 1230, 1235 (Utah 1980); Annotation, *State's Immunity from Tort Liability as Dependent on Governmental or Proprietary Nature of Function,* 40 A.L.R.2d 927 (1955); *see also Cobia v. Roy City,* 12 Utah 2d 375, 366 P.2d 986 (1961) (governmental function); *Nestman v. South Davis County Water Improvement Dist.,* 16 Utah 2d 198, 398 P.2d 203 (1965) (proprietary function). Until 1987, the scope of the term was defined by our case law, as it had been before the Act was passed. *See Johnson v. Salt Lake City Corp.,* 629 P.2d 432, 433–34 (Utah 1981); *Standiford,* 605 P.2d at 1231–36; Note, 1967 Utah L.Rev. at 127–30. Until the major changes wrought by *Standiford* in 1980, the test for determining whether a function was "governmental" or "proprietary" required an analysis of whether the activity (1) was done for the general public good, (2) was generally regarded as a public responsibility, (3) gave special pecuniary benefit to the governmental entity, and (4) involved competition with free enterprise. *Greenhalgh v. Payson City,* 530 P.2d 799, 801 (Utah 1975); *Ramirez v. Ogden City,* 3 Utah 2d 102, 105, 279 P.2d 463, 465 (1955).

In 1978, the section was amended, cleaning up the prose and broadening the grant of immunity to include claims for "any injury which results from the exercise of a governmental function, *governmentally-owned hospital, nursing home, or other governmental health care facility.*" 1978 Utah Laws ch. 27, § 2, at 92 (emphasis added). These health care activities were not defined as governmental functions; rather, immunity was expanded to include them in reaction to one of our cases holding that such activities were *not* governmental

functions. *See Standiford,* 605 P.2d at 1238 (Hall, J., dissenting) (referring to legislature's reaction to *Greenhalgh,* 530 P.2d 799).[10] This new immunity was clearly subject to the exception language in the beginning of the amended sentence. *See* Utah Code Ann. § 63–30–3 (Supp.1979). It also preserved this court's responsibility to interpret the scope and meaning of "governmental function."

In *Standiford,* decided in 1980, we abandoned the traditional governmental/proprietary function distinction in favor of a more satisfactory and uniformly applicable standard. We held in *Standiford* that an activity is a governmental function if it is "of such a unique nature that it can only be performed by a governmental agency or [if] it is essential to the core of governmental activity." *Standiford,* 605 P.2d at 1237. We expressly recognized that we were expanding the scope of governmental liability under the Act, but also noted that it was our role to give meaning to the term "governmental function." *Id.* at 1235–37; *see also Johnson,* 629 P.2d at 433–34 (reviewing the logic and validity of *Standiford's* interpretation of the term "governmental function").

The legislature again amended section 63–30–3 in 1981, adding immunity for health care clinical training programs. As amended, the statute read:

> Except as may be otherwise provided in this act, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility, *and from an approved medical, nursing, or other professional health care clinical train-*

10. Language in *Frank v. State,* 613 P.2d 517, 519 (Utah 1980), decided five years after *Greenhalgh,* suggests that operation of a governmental health care facility is a governmental function after all. Such a construction is both unnecessary and inconsistent with the legislative intent. As we recognized in *Frank,* the legislature "resolved the health care classification question" by its amendment in 1978 granting immunity for such activities, subject to the Act's

exceptions. *Id.* The legislature did not define operation of a governmental health care facility as a governmental function; it granted immunity despite our holding in *Greenhalgh* that such activities were not governmental functions. Our interpretation here renders language to the contrary in *Frank* dictum, but the result and the remainder of the analysis are sound. See discussion of this point in *Condemarin v. University Hospital,* 775 P.2d 348, 351–52 (Utah 1989).

*ing program conducted in either public or private facilities.*

Utah Code Ann. § 63–30–3 (Supp.1981).

The preamble to the chapter enacting this amended version of section 63–30–3 notes that section 2 (amending section 63–30–3) is "providing immunity, subject to exceptions, from liabilities arising from [professional health care] clinical training programs." 1981 Utah Laws ch. 116, preamble, at 566. Similarly, the preamble to the chapter enacting the 1978 amendment discussed above recognized that its section 2 (again amending section 63–30–3) was "providing for the inclusion of governmental *proprietary* functions [operation of governmental health care facilities] within the purview of the Governmental Immunity Act...." 1978 Utah Laws ch. 27, preamble, at 91 (emphasis added). These statements of legislative intent demonstrate a legislative purpose to provide immunity for activities recognized by the legislature to fall outside the scope of governmental functions under the then-applicable analyses of this court in *Standiford* and *Greenhalgh*, respectively.

Next came the 1984 amendment, adding immunity for flood control activities. 1984 Utah Laws ch. 33, § 1, at 148. Before reviewing the legislative history surrounding this amendment, we briefly analyze defendant's interpretation of the amended section 63–30–3 in the context of the structure of the Act outlined above. Defendant argues that the amendment provides absolute immunity for flood control activities. At least until the time of the amendment, however, absolute immunity only applied to activities for which there was no waiver. There was (and is) no place in the structure of the Act for a *grant* of absolute immunity. A grant of absolute immunity should logically have been placed in a separate section from the general grant of qualified immunity (section 63–30–3) or, more likely, accomplished by excepting the immunized activity from all of the waivers to which it would otherwise be subject if placed in the general granting section (section 63–30–3).

The legislature could have amended the Act in one of these two ways to clearly signal an intent to grant absolute immunity, but it did not. In fact, it appears that the legislature did not intend to upset the existing statutory framework by granting absolute immunity for flood control activities. Although we recently held in *Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.*, 784 P.2d 459, 462 (Utah 1989), that flood control activities were governmental functions before the 1984 amendment to section 63–30–3 defined them as such, it would not have been clear to the legislature that this court would so hold. After our decisions in *Standiford* and *Johnson*, the legislature could reasonably have doubted whether we would hold flood control activities to be uniquely governmental in nature or essential to a core governmental activity. See discussion in *Rocky Mountain*, 784 P.2d at 462. In the preamble to the 1984 flood relief bill, the legislature noted that in amending section 63–30–3 by adding the paragraph on flood control activities, it was "clarifying flooding as a governmental function for purposes of governmental immunity...." 1984 Utah Laws ch. 33, preamble, at 148.

In discussion on the senate floor before roll call passage of the bill, Senator Fred Finlinson, sponsor of the bill, clarified the purpose of the amendment to the Governmental Immunity Act:

[W]hat we're really trying to do is encourage the public sector to take action to prevent damage. Salt Lake City is probably one of the ... and the Salt Lake County program with the tremendous effort they did through their flood control program—it did cost money, but they saved, you know, millions of dollars worth of damage to the private sector—and we want them to be able to make good decisions relative to flood control without worrying about somebody coming back and suing him less [sic] and second guessing him in that very situation.... [We want to] encourage them to make good decisions and get the benefit of it [sic] and not be worried about not doing anything because somebody might sue later.

Senate floor discussion of S.B. 97 (from recording of January 28, 1984 afternoon session).

In later discussion of the same bill on the house floor that day, Representative Willard Gardner answered a question regarding liability of the state for bad flood control decisions made by the state engineer under new powers bestowed by the bill by noting that affected persons "can seek injunction" against negligent decisions. Representative Gayle McKeachnie suggested that many "takings suits" would prevail if flood control decisions affected property. In summing up, Representative Ray Schmutz, referring to the whole bill, said that the state would "assume all liability" if it took control of bodies and streams of water pursuant to its new flood control powers. *See* House floor discussion of S.B. 97 (from recording of January 28, 1984 afternoon session).

There is nothing in the legislative history that would suggest that the legislature saw a need to upset the existing framework of the Governmental Immunity Act. It simply amended the Act to define flood control activities as governmental functions. We cannot find any urgent policy reasons that would have compelled the legislature to seek absolute immunity for flood control activities. The main policy sought to be advanced, per Senator Finlinson, was the promotion of action and protection of "good decisions" with regard to flood control. These ends are amply supported by qualified immunity: discretionary functions are immunized from suits for negligence, Utah Code Ann. § 63–30–10(1)(a) (1989), and other waivers that might waive immunity for such acts protect important constitutional and other state interests, as discussed below.

■ In addition to the legislative history and the need to harmonize the 1984 amendment with the logic and structure of the Act as a whole, there is another important reason for our conclusion that the legisla-

ture intended to subject the immunity it granted by the 1984 amendment to the "exceptions" expressed in the first paragraph of section 63–30–3. Our cases have consistently held that if alternative constructions of a statute are possible, we should adopt the one that leads to a minimum of constitutional conflict. *See, e.g., Mountain States,* 782 P.2d at 467; *Crawford v. Tilley,* 780 P.2d at 1252; *Critchlow v. Monson,* 102 Utah 378, 394, 131 P.2d 794, 802 (1942).

Although we are not treating constitutional claims here, other than one under article I, section 22 (no taking of private property without compensation), discussed below, we note that there may be other constitutional problems with a grant of absolute immunity for flood control activities, including possible conflicts with article I, sections 7 (no deprivation of property without due process), 11 (open courts provision), 18 (no impairment of obligation of contracts), and 24 (uniform operation of the laws). The waivers that apply to the general grant of immunity recognize some of these areas: section 63–30–5 waives immunity as to contractual obligations, section 63–30–6 waives immunity as to actions involving property,[11] sections 63–30–7, –8, –9, and –10 waive tort immunity,[12] and section 63–30–10.5, added by 1987 Utah Laws chapter 75 section 3, at 417, waives immunity for takings actions. Avoidance of these possible conflicts favors construction of section 63–30–3 to subject immunity for flood control activities to the waivers applicable to the remainder of the section.

Although this construction interprets the language "and governmental entities ... are immune from suit for any injury or damage resulting from [flood control] activities" to be no more than a reiteration of the immunity granted governmental functions in the first paragraph of section 63–30–3, we are persuaded that the weight of logic, legislative history, and constitutional imperatives supports the conclusion that

---

**11.** Before passage of the Act, Utah Code Ann. § 78–11–9 (1953; repealed 1971) allowed some actions involving property.

**12.** Utah Constitution article I, section 11 provides in part, "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law...."

the amendment does no more than define flood control activities to be governmental functions.[13]

### B. Discretionary Function Exception to Waiver of Immunity for Negligence: Utah Code Ann. § 63–30–10(1)(a)

■ Because we do not know which of defendant's arguments the trial court accepted in granting defendant's first motion to dismiss, we must also address Hansen's contention that defendant's actions were not discretionary functions for which the immunity generally waived for negligence is specifically retained. Utah Code Ann. § 63–30–10(1)(a).

As early as *Carroll v. State Road Commission*, 27 Utah 2d 384, 496 P.2d 888 (1972), we held that discretionary functions are those requiring evaluation of basic governmental policy matters and do not include acts and decisions at the operational level—those everyday, routine matters not requiring "evaluation of broad policy factors." 27 Utah 2d at 389, 496 P.2d at 891. We noted in *Frank* that the discretionary function exception is "intended to shield those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseeable ways from individual and class legal actions, the continual threat of which would make public administration all but impossible." *Frank*, 613 P.2d at 520.

In *Doe v. Arguelles*, 716 P.2d 279, 283 (Utah 1985), we held that a "decision or action implementing a preexisting policy is operational in nature and is underserving of protection under the discretionary function exception." In that case, a 14–year-old was sexually assaulted by a juvenile offender who was on placement in the community but had not been discharged from the Youth Detention Center. The victim's guardian sued the juvenile offender, the state, and the supervising probation officer, the latter two defendants on a theory of negligent supervision. Although we recognized that "a probation officer's policy decisions are discretionary," we held that "acts implementing the policy must be considered on a case-by-case basis to determine whether they are ministerial and thereby outside the immunity protections." *Id.* The case had been decided below on summary judgment, and we reversed and remanded for trial. *Id.*

The County argues that in its efforts to remove obstacles from the natural channel of Big Cottonwood Creek as part of its flood control program, its conduct necessarily involved an exercise of judgment and constituted a discretionary function. We disagree. We rejected this literal interpretation of "discretionary" in our earliest cases involving section 63–30–10(1)(a). *See, e.g., Carroll*, 27 Utah 2d at 389, 496 P.2d at 891.

More recently, in *Rocky Mountain*, 784 P.2d at 464, we held that in a case decided below on motion, where we did not have the benefit of a factual record, we could not determine as a matter of law whether all of the acts complained of were discretionary, and we left that determination to the trial court on remand. We must remand Hansen's claim for the same reasons.[14]

### C. Waiver of Immunity for Certain Actions Involving Property: Utah Code Ann. § 63–30–6

■ Hansen's final point with regard to immunity is that defendant waived immuni-

---

13. In 1987, the legislature amended the Act by adding its own definition of "governmental function," which would include flood control activities as well as almost all activities performed by governmental entities. 1987 Utah Laws ch. 75, § 2, at 416 (codified at Utah Code Ann. § 63–30–2(4)(a) (1989)). That definition is not before us, and we presume only to interpret the Act as it stood in May 1984.

14. We did hold in *Rocky Mountain* that "the design, capacity, and construction of the [City Creek] drainage system are discretionary func-

tions...." *Id.* at 464. The area we left undecided was whether the operation and maintenance of the system involved discretionary functions. Hansen's claims involve maintenance and operation of the County's flood control system, and although the acts he complains of appear to be operational and ministerial in nature, we simply do not have the proper record before us to so hold. On remand, we refer the trial court to our decisions in *Rocky Mountain* and *Little v. Utah State Division of Family Services*, 667 P.2d 49 (Utah 1983), for guidance.

ty under Utah Code Ann. § 63–30–6 (1989), which we have previously quoted in full. This argument is without merit. That section waives immunity only for actions to recover property, quiet title, clear title, or resolve disputes over mortgages or liens held by a governmental entity. Hansen has not alleged that defendant is holding his property without right; he alleged that defendant destroyed his property. Section 63–30–6 does not apply here.

## II. INVERSE CONDEMNATION

Hansen's second claim was for inverse condemnation based on article I, section 22 of the Utah Constitution. The trial court ruled, based on our case law, that article I, section 22 does not create a cause of action. We reverse that ruling and refer the trial court, the parties, and the reader to our decision in *Colman v. Utah State Land Board*, 795 P.2d 622 (Utah 1990) for analysis of the inverse condemnation issue. Because the posture of Hansen's claim is different from that decided in *Colman*, we will give the trial court some guidance for disposition of Hansen's inverse condemnation claim on remand.

[10, 11] We note first that to the extent that Hansen recovers in tort for any damages caused by defendant, the trial court need not apply the doctrine of inverse condemnation. Hansen may only recover once for his injuries. It may be, however, that some of the damage Hansen allegedly suffered resulted from the performance of discretionary functions by defendant. To the extent that such is shown to be the case, we now make clear that governmental immunity cannot apply to prohibit suit or recovery under an inverse condemnation theory. That would be unconstitutional under the interpretation we have given article I, section 22 in *Colman*.[15]

We reverse dismissal of both of Hansen's claims and remand for further proceedings consistent with this opinion.

HALL, C.J., and STEWART and ZIMMERMAN, JJ., concur.

HOWE, Associate J., concurs in the result.

---

15. In 1987, the legislature added section 63–30–10.5 to the Act. 1987 Utah Laws ch. 75, § 3, at 417. This section reads in pertinent part: "(1) Immunity from suit of all governmental entities is waived for the recovery of compensation from the governmental entity when the governmental entity has taken or damaged private property without just compensation." Utah Code Ann. § 63–30–10.5(1) (1989). This enactment corrects the constitutional defect discussed above for any inverse condemnation suit in which the governmental entity did not raise the defense of governmental immunity before April 27, 1987, the effective date of the amendment.