**2015 UT App 3**

## THE UTAH COURT OF APPEALS

KEVIN FAUCHEAUX,
Plaintiff and Appellant,

*v.*

PROVO CITY,
Defendant and Appellee.

Opinion
No. 20130690-CA
Filed January 2, 2015

Fourth District Court, Provo Department
The Honorable Fred D. Howard
No. 100401999

Ronald D. Wilkinson, Janet G. Peterson and
Marianne P. Card Attorneys for Appellant

Dennis C. Ferguson and Timothy J. Bywater,
Attorneys for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE GREGORY K. ORME and SENIOR JUDGE RUSSELL W. BENCH
concurred.[1]

VOROS, Judge:

¶1    Afraid that his wife, Helen Faucheaux, had overdosed on
prescription pills, Kevin Faucheaux called 911. When police

---

1. The Honorable Russell W. Bench, Senior Judge, sat by special
assignment as authorized by law. *See generally* Utah R. Jud.
Admin. 11-201(6).

officers arrived they concluded that Helen had not overdosed.[2] Despite Kevin's pleas that they call emergency medical technicians, the officers tucked Helen into bed and told Kevin to leave her alone. Sometime in the next couple of hours, Helen died. Kevin brought this wrongful-death action against Provo City in his capacity as personal representative of Helen's estate. The district court granted summary judgment in Provo's favor, ruling that Provo owed Helen no duty and that even if it did the Governmental Immunity Act protected Provo because the officers' actions were discretionary. We reverse and remand the case for further proceedings.


BACKGROUND[3]

¶2     Helen had a history of attempted suicide and prescription-drug abuse. Her prescription-drug abuse worsened after her incarceration, where she learned to "crush and snort Percocet and Flexeril" for a more intense high. In the years immediately before her death, Helen threatened or attempted suicide several times. In fact, on one occasion, her suicide attempt nearly proved successful: she "flat-lined," but paramedics were able to revive her.

---

2. Because Kevin and Helen Faucheaux have the same last name, for clarity we refer to them by their first names. Furthermore, we refer to Kevin Faucheaux as "Kevin" when referring to him in his personal capacity and as "Faucheaux" when referring to him in his capacity as personal representative of Helen's estate.

3. On an appeal from a summary judgment, we recite the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600. Consequently, most of the facts in this section are drawn from Kevin's affidavit.

¶3    One day in 2009, Helen appeared to be under the influence of prescription drugs. She and Kevin fought, after which both called the police. Because "Helen claimed she was injured," she went to the hospital but was released without treatment. Kevin picked Helen up from the hospital but "dropped her at home" to "keep the situation from escalating again."

¶4    After leaving, Kevin received a text message from Helen saying goodbye. Because this was "the type of text that Helen had sent [Kevin] in the past to make [him] think she was committing suicide and to manipulate [him] into coming home," Kevin did not immediately return. About an hour later, still before Kevin had returned home, Helen called the police, claiming that Kevin had locked her out of her home.

¶5    When Kevin returned home, he noticed a dusting of white powder on the "bathroom sink, floor, and door." He found Helen "stumbling around and unable to walk straight, using the wall to help her balance." Helen then "stumbled into the bathroom, and [Kevin] heard snorting noises." Helen spoke in slurred speech, and Kevin knew that "Helen was crushing pills." Now "worried that Helen's threat to commit suicide was serious," Kevin called 911, telling the operator that Helen needed "to be pink-slipped because she was suicidal" and that Helen had been abusing drugs.[4]

¶6    The officers arrived at about 10:00 p.m. Kevin met them outside. He told the officers that he had "concerns that Helen

---

4. "Pink slip" is a term sometimes used to refer to the document used to initiate the temporary restraint of a mentally ill person. *See* Douglas Mossman, *Psychiatric Holds for Nonpsychiatric Patients*, Current Psychiatry, March 2013, at 34, 34. This is apparently the sense in which Kevin used the term.

was attempting suicide," that he "was seriously concerned she had overdosed," and that she had sent him a text message saying goodbye. He told the officers that Helen had been "crushing and snorting her prescription drugs," that if they looked in the bathroom they "would see crushed powder all over it and Helen's mortar and pestle that she used to crush her pills," and that Helen had already attempted suicide twice that year.

¶7 The police went inside to talk to Helen. According to the officers, Helen maintained that she had taken her pills only as prescribed, that she was not suicidal, and that the white powder resulted from baking pancakes. The officers then concluded that Helen had not overdosed, so they "tucked her into bed."

¶8 After helping Helen to bed, the officers told Kevin that Helen just needed to "sleep it off." However, still concerned about Helen, Kevin "pleaded with [the officers] to call the EMTs" to ensure that Helen had not overdosed. He explained to the officers that he could not get Helen to the hospital himself. The officers responded, "You don't need to get her to the car sir, you just need to leave her alone." The officers then told Kevin that if they received another call where he was the disturbance, they would arrest him.

¶9 After Kevin's discussion with the police, he stayed in the home but stayed away from Helen "as the officers had instructed." However, after about twenty minutes, Kevin opened Helen's bedroom door to check on her. She was lying in her bed, "apparently asleep." Kevin went back to the living room and watched a movie, returning to the bedroom to check on her a couple of hours later. This time, he found her dead.[5]

---

5. The officers' version of events differs slightly from Kevin's. According to the officers, they did not tuck Helen into bed, tell

(continued...)

¶10    Kevin sued Provo City in his capacity as the personal representative of Helen's estate, alleging that the police officers acted negligently. After discovery, the district court granted summary judgment in Provo's favor, ruling that Provo owed Helen no duty of care and that, even if it did, Provo was immune from suit. This appeal followed.

## ISSUE ON APPEAL

¶11    Faucheaux contends that the district court erred in granting summary judgment in Provo's favor for two reasons. First, Faucheaux argues that the district court erred in concluding that Provo owed Helen no duty of care. Second, Faucheaux argues that the district court erred in concluding that Provo is immune from this lawsuit because the officers' actions qualify as discretionary.

## ANALYSIS

### I. The District Court Erred in Concluding That the Police Officers Owed Helen No Duty of Care.

¶12    Faucheaux first contends that the district court erred in concluding that the police officers owed Helen no duty of care. Faucheaux argues that "a special relationship between police and Helen arose when police undertook specific action to protect Helen." Provo responds that "Utah law does not impose a

---

Kevin to leave Helen alone, or tell Kevin that Helen needed to "sleep it off." But at the summary judgment stage we recite the facts and draw all reasonable inferences in the light most favorable to the nonmoving party, Faucheaux. *See Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

'special relationship' duty on a peace officer who responds to a welfare check."

¶13 Summary judgment should be awarded only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We review a grant of summary judgment for correctness. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600.

¶14 To prove a claim of negligence, the "plaintiff must establish four essential elements: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Hunsaker v. State,* 870 P.2d 893, 897 (Utah 1993) (citations omitted). A "[d]uty arises out of the relationship between the parties and imposes a legal obligation on one party for the benefit of the other party." *Torrie v. Weber County*, 2013 UT 48, ¶ 9, 309 P.3d 216 (citation and internal quotation marks omitted). Furthermore, duty determinations should be expressed in "relatively clear, categorical, bright-line rules of law applicable to a general class of cases." *Jeffs ex rel B.R. v. West,* 2012 UT 11, ¶ 23, 275 P.3d 228 (citation and internal quotation marks omitted). However, "because negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, summary judgment is appropriate in negligence cases only in the clearest instances." *Nelson v. Salt Lake City*, 919 P.2d 568, 571 (Utah 1996) (citation and internal quotation marks omitted).

¶15 To show that the defendant owed the plaintiff a duty of care "is more complicated when the government is the defendant." *Francis v. State*, 2013 UT 65, ¶ 25, 321 P.3d 1089. Under the public-duty doctrine, "[i]f a plaintiff's claim is based on the defendant's failure to adequately discharge a public duty, a presumption arises that this duty may not be a basis for liability in a lawsuit." *Cope v. Utah Valley State College*, 2014 UT

53, ¶ 30. Our supreme court has defined a public duty as "an obligation owed to the general public at large." *Id*. ¶ 31 (citation and internal quotation marks omitted). Thus, under the public-duty doctrine "a governmental entity is not liable for injury to a citizen where liability is alleged on the ground that the governmental entity owes a duty to the public in general, as in the case of police or fire protection." John H. Derrick, Annotation, *Modern Status of Rule Excusing Governmental Unit from Tort Liability on Theory That Only General, Not Particular, Duty Was Owed Under Circumstances*, 38 A.L.R. 4th 1194, § 2 (1985), *cited with approval in Cope*, 2014 UT 53, ¶ 31.

¶16 However, the public-duty doctrine "applies only to the omissions of a governmental actor." *Cope*, 2014 UT 53, ¶ 2. Thus, "[w]here the affirmative acts of a public employee actually cause the harm . . . the public duty doctrine does not apply." *Id*. ¶ 24. Affirmative acts include "active misconduct working positive injury to others, while omissions are defined as passive inaction, [i.e.,] a failure to take positive steps to benefit others, or to protect them from harm." *Id.* ¶ 35 (alteration in original) (citation and internal quotation marks omitted). A negligent affirmative act leaves the plaintiff "positively worse off as a result of the wrongful act," whereas in cases of negligent omissions, the plaintiff's "situation is unchanged; [she] is merely deprived of a protection which, had it been afforded [her], would have benefitted [her]." Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, 56 U. Pa. L. Rev. 217, 220 (1908).

¶17 Finally, if a plaintiff's claims are based on an omission of a governmental actor, "courts will recognize the duty only if the plaintiff establishes a special relationship that imposes a specific duty of care toward the plaintiff as an individual that is distinguishable from a public duty owed to the general public." *Cope*, 2014 UT 53, ¶ 12. To determine whether a special relationship exists in a particular case, and thus whether a duty exists, we have always "taken a policy-based approach." *Higgins v. Salt Lake County*, 855 P.2d 231, 236 (Utah 1993). We carefully

consider the consequences of imposing a duty and "are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship." *Id.* at 237.

¶18 Our caselaw creates special relationships in at least four circumstances:

> (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.

*Day v. State*, 1999 UT 46, ¶ 13, 980 P.2d 1171. At issue here are circumstances (2) and (3): whether the officers undertook specific action to protect Helen or reasonably induced detrimental reliance on their actions.[6]

¶19 Here, the district court erred in ruling as a matter of law that the public-duty doctrine shields Provo. Faucheaux's negligence claim may be interpreted in one of two ways. On the one hand, Faucheaux does allege negligent affirmative acts—not

---

6. On appeal, Faucheaux also argues that the district court erred because a statute created a duty of care. But in a hearing before the district court, Faucheaux specifically stated, "[W]e are not claiming" that a statute created the duty here. Thus, Faucheaux invited this alleged error, and we consequently decline to address it. *See Pratt v. Nelson*, 2007 UT 41, ¶ 17, 164 P.3d 366.

merely omissions—of the officers. *See Cope*, 2014 UT 53, ¶ 24. Faucheaux alleges that the officers came to Helen's home when she was so intoxicated that she could hardly walk or talk; that instead of taking her to the hospital they proceeded to tuck her into bed, admonishing Kevin to "leave her alone" and telling him that Helen needed to "sleep it off"; and that they threatened to arrest him if they received another call. These alleged acts constitute "active misconduct working positive injury to others," *id.* ¶ 35 (citation and internal quotation marks omitted), especially considering our "societal expectation of unquestioned [police] command" in such situations, *Brendlin v. California*, 551 U.S. 249, 258 (2007) (alteration in original) (citation and internal quotation marks omitted). Faucheaux does not allege only that the officers withheld a protection that would have benefitted Helen but that the officers' actions left Helen worse off. Therefore, because Faucheaux can, at least in theory, trace Helen's death to an affirmative act by the officers, the district court erred in ruling as a matter of law that the public-duty doctrine shields Provo. *See Cope*, 2014 UT 53, ¶ 37. The officers, Faucheaux alleges, did not merely fail to help, they hindered.

¶20     On the other hand, the officers did not actually cause the harm. *Id.* ¶ 2. They did not administer the prescription medications that Faucheaux alleges killed Helen. But even if we were to interpret Faucheaux's claim as based on omissions, under Faucheaux's version of events—and perhaps the officers' version as well—the officers created a special relationship with Helen. Faucheaux argues that the officers created a special relationship by undertaking specific action to protect Helen. To succeed on this argument, Faucheaux must show first that the police officers "undertook specific action," and second that "those actions were intended to protect a person or property." *See Francis v. State*, 2013 UT 65, ¶ 27, 321 P.3d 1089.

¶21     Here, Faucheaux's version of the facts supports his allegation that the officers created a special relationship with Helen. First, under Faucheaux's version of events, the police

officers "undertook specific action" by entering Helen's home, asking her if she was suicidal, asking her about the powder they found on her, and then tucking her into bed. *See id*. Second, these actions "were intended to protect" Helen. *See id.* Thus, assuming the truth of Faucheaux's version of events, the officers created a special relationship with Helen and consequently owed her a duty to act reasonably.

¶22    We draw support for this conclusion from our supreme court's decision in *Francis*, 2013 UT 65. There, the supreme court held that the State created a special relationship with a camper who was mauled by a black bear because the State undertook specific action to protect an identifiable group. *Id.* ¶¶ 31, 33. In *Francis*, the Division of Wildlife Resources received a report about a black bear attacking a camper. *Id.* ¶ 9. After the Division learned of the attack, it decided to "track and destroy the bear" because the bear posed "a threat to public safety." *Id.* ¶ 10. The Division tracked the bear with dogs for "four to five hours, with no success." *Id.* ¶ 11. Knowing that the bear "would likely return" to the campsite "if attracted," the Division's agents "checked the [c]ampsite to make sure it was unoccupied and clean of any [bear] attractants." *Id.* But the Division's agents "made no effort to warn anyone who might arrive" at the campsite after they left. *Id.* ¶ 12. As the Division's agents left the campsite they drove past a family heading toward the campsite. *Id.* ¶ 13. The agents did not stop the family or warn them of the earlier attack "but merely waved as they passed." *Id.* After passing the Division's agents, the family set up the campsite and cooked dinner. *Id.* ¶ 14. A little later, the bear returned, attacking and killing one of the campers. *Id.* Our supreme court held that because the Division undertook action to protect "the next group to use the campsite," the Division created a special relationship with the next occupants of the campsite and that consequently the Division owed them a duty of care. *Id.* ¶ 4.

¶23    Like the Division's employees in *Francis*, the police officers here did not originally have a special relationship with

Helen. In *Francis*, agents created the special relationship when they tracked the bear, returned to the campsite, made sure the campsite was free of bear attractants, and waved at the family heading toward the campsite. Here, the officers created the special relationship when they entered Helen's home, took control of the situation, asked Helen if she was abusing drugs and suicidal, asked her about the powder they found on her, and subsequently tucked her into bed, directing Kevin to leave her alone.

¶24    Provo counters that police officers do not have a duty to protect people from harming themselves. We agree that police officers have no general duty to protect people from harming themselves. But our supreme court has declared that a special relationship arises "when a government agent undertakes specific action to protect a person or property." *Day v. State*, 1999 UT 46, ¶ 13, 980 P.2d 1171. We conclude that, under this rule, if a police officer enters a person's home concerned that the person may have overdosed and undertakes specific action to protect that person, the officer creates a special relationship with that person and consequently must act reasonably.

¶25    We reiterate that we "are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship." *Higgins v. Salt Lake County*, 855 P.2d 231, 237 (Utah 1993). But to recognize a special relationship on facts as alleged by Faucheaux does not create a duty realistically incapable of performance. Rather, this holding imposes on police officers the duty to act reasonably when they enter a person's home, undertake specific action to protect that person, and prevent others in the home from taking protective action.

¶26    Provo further argues that a Utah statute precludes imposing a duty on the officers here. The statute in question states that police officers "may" take a person into protective custody if the officer has "probable cause." *See* Utah Code Ann.

§ 62A-15-629(2) (LexisNexis 2012). Provo asserts that the officers did not have probable cause here and therefore could not remove Helen from her home. Because the officers "lacked the statutory authority to forcibly remove Helen from her home," Provo argues, they owed her no duty.

¶27    This argument misses the mark. Faucheaux does not contend that the officers acted negligently only by not taking Helen into custody. Rather, Faucheaux alleges that the officers formed a special relationship with Helen and thus owed her a duty to act reasonably. The officers could have discharged this duty in a number of ways without taking Helen into custody. And even if Provo is right "that the officers lacked the statutory authority to forcibly remove Helen from her home," this argument addresses whether the officers acted reasonably, not whether they had a duty to act reasonably. In sum, a statute authorizing police to remove a person from her home with probable cause does not protect them from a claim that their actions placed her in danger and prevented others from addressing that danger.

¶28    In conclusion, we hold that the district court erred in ruling as a matter of law that the public-duty doctrine shields Provo from Faucheaux's negligence claim. First, to the extent Faucheaux bases his claim on the affirmative negligent acts of the officers, the public-duty doctrine is not available. Second, to the extent Faucheaux bases his claim on alleged omissions, the officers created a special relationship with Helen. Thus, the district court incorrectly granted summary judgment in Provo's favor.

## II. Utah's Governmental Immunity Act Does Not Protect Provo from the Officers' Nondiscretionary Acts.

¶29    Faucheaux next contends that the district court erred in concluding that Utah's Governmental Immunity Act immunizes Provo from this lawsuit. Faucheaux argues that Provo "is not

immune from suit under the Governmental Immunity Act because [the] police officers were not performing a discretionary function when they responded to Kevin's 911 call." Provo responds that a statute giving police discretion to detain mentally ill persons who may harm themselves or others illustrates the discretionary nature of the officers' actions.

¶30    A district court's interpretation of a statute is a question of law. *Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 10, 227 P.3d 256. Consequently, we review the interpretation for correctness. *Id.*

¶31    Sovereign immunity, "rooted in the medieval British notion that the King could do no wrong, precludes lawsuits against governmental entities without the government's consent." *Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 13, 986 P.2d 752. Utah's Governmental Immunity Act first grants general immunity from suit to governmental entities. Utah Code Ann. § 63G-7-201(1) (LexisNexis 2012). The Act then narrows that general grant by waiving immunity for certain claims, including claims for injuries proximately caused by "a negligent act or omission." *Id.* § 63G-7-301(4). However, the Act then creates exceptions to those waivers of immunity. *Id.* § 63G-7-301(5). For example, the Act retains immunity for injuries that arise out of the "exercise or performance, or the failure to exercise or perform, a discretionary function, whether or not the discretion is abused." *Id.* § 63G-7-301(5)(a).

¶32    "To determine whether governmental action qualifies for the discretionary function exception," we must first ask whether the "challenged act, omission, or decision necessarily involve[s] a basic governmental policy, program, or objective." *Johnson v. Utah Dep't of Transp.*, 2006 UT 15, ¶ 22, 133 P.3d 402 (citation and internal quotation marks omitted). But "[n]ot every governmental action involving discretion is a discretionary function within the meaning of the Act. Were it otherwise, the exception would swallow the rule, as almost all governmental decisions involve some discretion." *Trujillo*, 1999 UT App 227,

¶ 21 (citing *Nelson v. Salt Lake City*, 919 P.2d 568, 575 (Utah 1996)). "[D]iscretionary functions are those requiring evaluation of basic governmental policy matters and do not include acts and decisions at the operational level, namely those everyday, routine matters not requiring evaluation of broad policy factors." *Johnson*, 2006 UT 15, ¶ 31 (citation and internal quotation marks omitted).

¶33 Utah caselaw has identified two policies that this discretionary-function immunity serves. First, discretionary-function immunity "shield[s] those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseeable ways from individual and class legal actions, the continual threat of which would make public administration all but impossible." *Hansen v. Salt Lake County*, 794 P.2d 838, 846 (Utah 1990) (citation and internal quotation marks omitted). Second, where "the responsibility for basic policy decisions has been committed to one of the branches of our tri-partite system of government," discretionary-function immunity preserves the autonomy of coordinate branches of government by keeping courts from "sitting in judgment" of other branches' policy-making decisions. *Little v. Utah Div. of Family Servs.*, 667 P.2d 49, 51 (Utah 1983).

¶34 Our caselaw illustrates the distinction between policy-level decisions, which qualify for discretionary-function immunity, and operational-level decisions, which do not. For example, this court previously held that the Utah Department of Transportation's formulation of a traffic-control plan, including its decision to use barrels instead of concrete barriers to separate traffic, did not qualify for discretionary-function immunity, because the control plan was not "the product of the exercise of policy-level discretion." *Trujillo*, 1999 UT App 227, ¶ 33. In contrast, our supreme court held that a decision not to raise concrete barriers during construction qualified for discretionary-function immunity as "studies of the plan, its cost, and the degree of safety it would provide were carried out by senior

engineers and circulated throughout and debated within the department." *Keegan v. State*, 896 P.2d 618, 624 (Utah 1995).

¶35   The officers' actions as alleged by Faucheaux do not qualify for the discretionary-function exception. Their alleged acts and omissions include, among other things, answering Kevin's 911 call, evaluating Helen's condition, asking Helen about her prescription-drug use, failing to take Helen to the hospital, refusing to assist Kevin in getting Helen to the car, refusing to call emergency medical technicians, and tucking Helen into bed. These acts and omissions do not require "evaluation of basic governmental policy matters." *Johnson*, 2006 UT 15, ¶ 31 (citation and internal quotation marks omitted). Rather, they occurred at "the operational level" and qualify as actions "not requiring evaluation of broad policy factors." *Keegan*, 896 P.2d at 623 (citation and internal quotation marks omitted).

¶36   Nevertheless, Provo argues that it is immune from suit because the Utah Code provides that officers "may" take a person into protective custody against the person's will. *See* Utah Code Ann. § 62A-15-629(2) (LexisNexis 2012). But the fact that an officer's action required the exercise of some amount of discretion does not qualify it as discretionary for purposes of Utah's Governmental Immunity Act. As stated above, "[n]ot every governmental action involving discretion is a discretionary function within the meaning of the Act. Were it otherwise, the exception would swallow the rule, as almost all governmental decisions involve some discretion." *Trujillo v. Utah Dep't of Transp.*, 1999 UT App 227, ¶ 21, 986 P.2d 752. The relevant question asks whether the discretionary act occurred at the "operational level" or required "evaluation of broad policy factors." *See Johnson*, 2006 UT 15, ¶ 31 (citation and internal quotation marks omitted). The officers' acts as alleged by Faucheaux fall squarely into the former category.

CONCLUSION

¶37    The district court erred in concluding as a matter of law that the public-duty doctrine shields Provo from liability. To the extent Faucheaux bases his negligence claim on the alleged affirmative acts of the officers, the public-duty doctrine is not available. Furthermore, to the extent Faucheaux bases his negligence claim on omissions, the district court erred in ruling that officers did not create a special relationship with Helen. Additionally, we conclude that the Governmental Immunity Act does not immunize Provo from the officers' actions and omissions. Consequently, the district court's decision is reversed and the case remanded for further proceedings.

_____