2005 UT 80

James WEBB, Plaintiff and Respondent,

v.

The UNIVERSITY OF UTAH, a division of the State of Utah, Park Plaza Condominium Owners' Association, a Utah nonprofit corporation, and Jonette Webster, Defendants and Petitioner.

No. 20040282.

Supreme Court of Utah.

Nov. 15, 2005.

Brent Gordon, Salt Lake City, for respondent.

Mark L. Shurtleff, Att'y Gen., Debra J. Moore, Sandra L. Steinvoort, Asst. Att'ys Gen., Salt Lake City, for petitioner.

NEHRING, Justice:

## INTRODUCTION

¶1 We granted certiorari to review the court of appeals' holding that the University of Utah owed Mr. Webb a "duty to exercise ordinary and reasonable care when it directs students to engage in specific activities as

part of its educational instruction." We reverse.

## BACKGROUND[1]

¶ 2 Mr. Webb was a University of Utah student enrolled in an earth sciences class. As part of the required course curriculum, Mr. Webb attended a field trip to a condominium complex to examine fault lines in the Salt Lake County area. Mr. Webb and other students were directed to walk on icy and snowy sidewalks through the condominium complex. While Mr. Webb was standing on a complex sidewalk, a fellow student slipped and grabbed Mr. Webb for support, causing him to fall and sustain injuries.

¶ 3 Mr. Webb sued the University of Utah and others. He alleged the University was negligent in directing students to occupy and traverse the condominium sidewalks on a school-organized, curriculum-related field trip. The University filed a rule 12(b) motion to dismiss on the grounds that no special relationship existed between Mr. Webb and the University and, therefore, the University owed Mr. Webb no duty. The trial court granted the University's motion and dismissed Mr. Webb's claims against it. Mr. Webb appealed.

¶ 4 The court of appeals reversed. The court held that the allegations in Mr. Webb's complaint adequately described a legal duty owed by the University to Mr. Webb. This duty was not one based on a special relationship, but rather a general negligence duty to "exercise ordinary and reasonable care when directing its students to take a certain route on a required field trip." The court of appeals was drawn to this characterization of the University's duty because it interpreted the allegation that Mr. Webb's instructor required the class to enter a dangerous area on a required school field trip to mean that the University had committed an affirmative act, thereby eliminating the need for the existence of a special relationship as a predicate for the creation of a duty. The court summarized its reasoning in its comment that "the University does owe a duty to exercise ordinary and reasonable care when

it affirmatively acts in directing its students to perform certain tasks as part of its curriculum." *Webb v. Univ. of Utah*, 2004 UT App 56, 88 P.3d 364. Despite its determination that the University owed Mr. Webb an ordinary negligence duty, it was unwilling to concede the absence of a special relationship, noting that "were a special relationship required in this case, the facts alleged by Webb are sufficient to establish a special relationship." *Id.*

¶ 5 The University of Utah sought certiorari review to decide whether (1) the court of appeals erred in holding that, in the absence of a special relationship, the University can be held liable in negligence for injury sustained by a student on a field trip and (2) whether the court of appeals erred in concluding that the allegations of the complaint suffice to establish a special relationship between Webb and the University.

## STANDARD OF REVIEW

¶ 6 "When reviewing cases under certiorari jurisdiction, we apply a standard of correctness to the decision made by the court of appeals rather than the trial court." *Brigham City v. Stuart*, 2005 UT 13, ¶ 7, 122 P.3d 506.

## ANALYSIS

¶ 7 The central challenge confronting us in this case is to make sense of the scene where common law negligence and governmental immunity law have collided. The court of appeals took on the same task. *Webb v. Univ. of Utah*, 2004 UT App 56, 88 P.3d 364. Although we disagree with the outcome of its effort, we attribute our decision to reach a different result to our conflicting readings of confusing cross-currents of tort law. The court of appeals' holding turns on the premise that, irrespective of the existence of legal forces that shape the tort liability of governmental entities, such as the public duty doctrine, the special relationship doctrine, and the governmental immunity statutes, an affirmative act by a governmental actor triggers the application of the general duty to act reasonably in the circumstances. *Id.* ¶¶ 6, 8. In the view of the court of appeals, where an affirmative act by a governmental actor is

1. All facts are taken from *Webb v. University of* *Utah*, 2004 UT App 56, 88 P.3d 364.

found, all other considerations must yield. *Id.*

¶ 8 The court of appeals buttressed its holding by stating that even if a special relationship was necessary to establish liability, that relationship could be present in the relationship between the University actor and Mr. Webb. We now explain why neither of these grounds for the court of appeals' holding is viable.

## I. THE SPECIAL RELATIONSHIP AS A SOURCE OF DUTY

■■■ ¶ 9 To establish a claim of negligence, the "plaintiff must establish four essential elements: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Hunsaker v. State,* 870 P.2d 893, 897 (Utah 1993) (citations omitted). "Duty arises out of the relationship between the parties and imposes a legal obligation on one party for the benefit of the other party." *Delbridge v. Maricopa County Cmty. Coll. Dist.,* 182 Ariz. 55, 893 P.2d 55, 58 (1994). "A court's conclusion that duty does or does not exist is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection.'" *Univ. of Denver v. Whitlock,* 744 P.2d 54, 57 (Colo.1987) (quoting *Prosser and Keeton on the Law of Torts* § 53, at 358 (5th ed.1984)).

■■■ ¶ 10 The court of appeals correctly observed that as a general proposition of tort law, the distinction between acts and omissions is central to assessing whether a duty is owed a plaintiff. *Webb,* 2004 UT App 56, ¶ 6 n. 3, 88 P.3d 364; *see also* Restatement (Second) of Torts § 302 (1965). In almost every instance, an act carries with it a potential duty and resulting legal accountability for that act. By contrast, an omission or failure to act can generally give rise to liability only in the presence of some external circumstance—a special relationship. Restatement (Second) of Torts § 314A (1965). The Restatement describes the following as examples of special relationships: common carrier to its passenger, innkeeper and guest, landowner and invitees to his land, and one who takes custody of another. *Id.* As we have explained, "[t]hese relationships generally arise when one assumes responsibility for another's safety or deprives another of his or her normal opportunities for self-protection." *Beach v. Univ. of Utah,* 726 P.2d 413, 415 (Utah 1986). The "essence of a special relationship is dependence by one party upon the other or mutual dependence between the parties." *Id.* (citations omitted).

¶ 11 In situations not involving governmental actors, the duality between omission and action serves as a workable analytical tool. In the realm of governmental actors, however, matters change. In a fundamental way, governmental actors owe a duty to the public at large or at least to that segment of the public which visits the particular realm of responsibility served by the governmental actor. In a very real sense, the professional lives of governmental actors are comprised of an unending sequence of actions and failures to act that in many instances can directly affect the health, safety, and general well-being of citizens. As a matter of public policy, we do not expose governmental actors to tort liability for all mishaps that may befall the public in the course of conducting their duties. *Day v. State,* 1999 UT 46, ¶ 10, 980 P.2d 1171. Doing otherwise would have the likely effect of reducing the pool of potential public servants. Our search for sound public policy has led us, however, to decide that governmental actors should be answerable in tort when their negligent conduct causes injury to persons who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor. *Id.* ¶¶ 12–13.

¶ 12 The use of the special relationship label to describe persons who may be entitled to recover in tort from governmental actors is a potential source of confusion because it is the same nomenclature that the law uses to describe the class of persons who may be owed a duty arising from another's failure to act under general tort law principles. *See Black's Law Dictionary* 1405 (7th ed.1999) (defining special relationship as "[a] nonfiduciary relationship having an element of trust, arising [especially] when one person

trusts another to exercise a reasonable degree of care" and defining special-relationship doctrine as "[t]he theory that if a state has assumed control over an individual sufficient to trigger an affirmative duty to protect that individual, then the state may be liable for harm inflicted on the individual"). Thus, identical terminology is used to describe two tort concepts that, while very different, occupy domains just close enough to one another to promote confusion.

¶ 13 "Special relationship" therefore has two meanings: one applicable to the general tort duty analysis, the other defining the necessary predicate to the creation of a duty in a governmental actor. *Id.* As noted above, when used in the context of ordinary negligence, a special relationship is what is required to give rise to a duty to act, whereas the existence of a special relationship relating to a governmental actor can result in the imposition of liability for either her acts or her failure to act.

¶ 14 A presence or an absence of a special relationship is not determined by titles or job descriptions. Nor is the presence or absence of a special relationship immutable. A governmental actor can create a special relationship, where one did not previously exist, by her acts. Thus the commission of an affirmative act by a governmental actor does not lead directly to the duty question as it would in the case of a non-governmental actor, but instead provides relevant information about whether a special relationship existed between the governmental actor and the injured party requiring the imposition of a legal duty on the governmental actor. *Day,* 1999 UT 46, ¶ 13, 980 P.2d 1171.

¶ 15 Much of the confusion surrounding the concept of the special relationship can be traced to the easily misapprehended "duty to protect" concept. Generally, the duty to protect is allied with the failure-to-act element of general negligence law. The duty of a private citizen to act in aid of another, the duty to protect, arises only where a special relationship is found to exist. Restatement (Second) of Torts § 314A. Similarly, under ordinary negligence principles, the duty-to-

protect concept has no application where a duty arises from an affirmative act. Once a special relationship is found, the governmental actor's duty not to act negligently follows. *Id.* This duty encompasses both acts and failures to act. *Id.*

¶ 16 How does this explanation of the special duty problem play itself out in Mr. Webb's case? The court of appeals determined that the governmental actor's affirmative act of directing students to traverse the icy sidewalk permitted the court to sidestep the entire special relationship question. This attempt to sidestep was a misstep. As we explained earlier, governmental actors are not accountable for their affirmative acts unless a special relationship is present. *Day,* 1999 UT 46, ¶ 13, 980 P.2d 1171. This concept is the essence of the "public duty doctrine." *Id.* ¶ 12. Without a special relationship, the University owed no duty to Mr. Webb. The discovery of an affirmative act could not create one by itself.

¶ 17 We turn now to the court of appeals' fallback position: that the governmental actor had a special relationship with Mr. Webb. Where did this relationship come from, and what made it "special"? According to the court of appeals, the special relationship was created by the degree of control exercised by the university actor over the class. He told them to walk on the snow- and ice-covered sidewalk. The sidewalk's surface was dangerous—at least in hindsight. The court of appeals determined that by using his authority to put the class in peril, the university actor created a special relationship with the class members.

¶ 18 How do we know when a situation is perilous enough to create a special relationship? The court of appeals says the situation that Mr. Webb's class faced was "fraught with unreasonable risk." Thus, the questions that may be asked include, as pleaded and indulging it all the inferences to which it is entitled, did Mr. Webb's complaint allege facts from which it could be concluded that, as a matter of law, the university actor exercised such control over the class as to expose them to an unreasonable risk of injury on the sidewalk? We hold that it did not.

¶ 19 University personnel do not generally have a special relationship with students. *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir.2003). "The general question of whether university school officials and students have a 'special relationship' such that there is an affirmative duty to protect and keep free from foreseeable harm ... has not been addressed by the United States Supreme Court." *Apffel v. Huddleston*, 50 F.Supp.2d 1129, 1132 (D.Utah 1999). However, a number of jurisdictions and academic publications have endorsed the view that "since the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students." *Freeman*, 349 F.3d at 587. This follows the modern presumption that a university does not stand in loco parentis to its student body and it does not have a "special custodial duty" to its student body. *Id.*

¶ 20 We relied on that theme in our analysis and holding in *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986), which also involved a University student who sustained injuries on a school-related field trip, which she claimed were due to negligence on the part of the University and the breach of her special relationship with the University. Ms. Beach participated in an off-campus, University-sponsored field trip; at a dinner event she became intoxicated and, after she was transported back to the campground, wandered off, fell down a cliff, and sustained permanent physical injuries. She sued the University, alleging that a special relationship existed between the institution, her professor, and herself. She alleged the special relationship gave rise to an affirmative duty on the part of the instructor to supervise and protect her.

¶ 21 The *Beach* court began its analysis as we have today. An essential element of a negligent action is that the defendant owes a duty of reasonable care to the plaintiff. *Id.* at 415. Absent a showing of duty, a plaintiff cannot recover. *Id.* The *Beach* court held that "[o]rdinarily, a party does not have an affirmative duty to care for another." *Id.* Ms. Beach claimed, however, that the University and her instructor owed her an affir-mative duty. Ms. Beach bolstered her argument with the claim that her instructor, through a prior experience with Ms. Beach on another field trip, "knew or should have known of her propensity to become disoriented after drinking," and therefore, "the University had a special duty to supervise her on the evening in question." *Id.* at 416.

¶ 22 We turned away Ms. Beach's arguments and held that the University owed her no duty. We reasoned that the prior field trip to Lake Powell in which Ms. Beach "became dizzy when she reached the bushes after leaving the rest of the company" provided nothing "within [the instructor's] sight that would have alerted [him] ... to the fact that she had a tendency to become dizzy or disoriented when she consumed alcohol." *Id.* Thus the earlier field trip was "not determinative of whether a special relationship arose." *Id.* The *Beach* court found no characteristics of a special relationship between Ms. Beach and the University or her instructor. As a result, the court concluded that "[b]ecause no special relationship existed, the University had no affirmative obligation to protect or supervise her and no duty was breached." *Id.*

¶ 23 Despite the result in *Beach*, we are persuaded that a college instructor who has no special relationship with her class members in a benign academic setting can create a special relationship by altering the academic environment. We think that it is therefore possible for an instructor to sit in her office and plan a field trip to a domesticated destination like a condominium project without creating a special relationship, but can create a special relationship later upon arriving on the scene to find that the actual setting is not, in fact, domesticated, but perilous.

¶ 24 The hypothetical possibility that a special relationship can be created between an instructor and a student in a higher education setting flows from the fundamental reality that despite the relative developmental maturity of a college student compared to, say, a pre-schooler, a college student will inevitably relinquish a measure of behavioral autonomy to an instructor out of deference to her superior knowledge, skill, and experi-

ence. This is a phenomenon that should, and certainly does, at least unconsciously guide all decisions made by instructors relating to the selection of an environment for learning.

¶ 25 The harder question is to determine how much loss of autonomy a student must sustain and how much peril must be present to establish a special relationship. We are not prepared to endorse the State's position that every college student is responsible for his own protection in any school-related activity, regardless of the risk. The experience of courts in other jurisdictions gives us ample reason to leave open the possibility that a special relationship may emerge from the university-student relationship. For example, universities have been held liable for school-related accidents involving assaults in student dormitories and fraternity hazing incidents. *Furek v. Univ. of Delaware*, 594 A.2d 506 (Del.1991); *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 449 N.E.2d 331 (1983). Some have also rejected university liability if the student assumed what was a clearly identifiable and obvious danger. *See Breheny v. Catholic Univ. of Am.*, No. 88–3328–OG, 1989 WL 1124134, at *1–3, 1989 U.S. Dist. LEXIS 14029, at *3–8 (D.D.C. Nov.22, 1989) (the plaintiff sued the University after fracturing her ankle in an intramural touch football game. *Id.* at *1, 1989 U.S. Dist. LEXIS 14029, at *3–4. The plaintiff admitted the field was drenched and muddy from a prior rain storm. *Id.* at *2–3, 1989 U.S. Dist. LEXIS 14029, at *7. The court held that "[t]here are situations in which the danger is so patent or well known that, as a matter of law, a participant assumes the risk." *Id.* at *3, 1989 U.S. Dist. LEXIS 14029, at *8. The court found the plaintiff had knowledge and appreciation of the risk and voluntarily assumed that risk, and therefore, the university was not negligent, *id.* at *4–5, 1989 U.S. Dist. LEXIS 14029, at *14). *But see Brigham Young Univ. v. Lillywhite*, 118 F.2d 836, 841–43 (10th Cir.1941) (where the court concluded the university instructor was negligent to a student for her injuries sustained by the instructor's failure to properly supervise students conducting experiments in the chemistry lab). One method to aid us in approaching the autonomy question is using the special relationship factors set out in *Day*

*v. State*, 1999 UT 46, 980 P.2d 1171. In *Day* we squarely faced the question of special relationship formation:

> A special relationship can be established (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.

*Id.* ¶ 13.

¶ 26 The third *Day* factor, that a special relationship may be created "by governmental actions that reasonably induce detrimental reliance by a member of the public," is relevant here. *Id.* A directive received in connection with a college course assignment is an act that would engage the attention of the prudent student. There are practical reasons for this. Students want to please their instructors. They want to succeed in their studies. They believe that the instructors have command of the subject matter and the environment in which it is taught. Many of these directives would be logical candidates to induce the kind of detrimental reliance we contemplated in *Day*.

■ ¶ 27 It is certainly possible that a directive inducing detrimental reliance may be one that creates an unreasonable risk of harm to the people expected to follow it. Viewed objectively, we conclude that the directive to occupy and traverse the condominium sidewalk does not meet this standard. We reach this conclusion for several reasons. First, the directive given Mr. Webb's class did not relate directly to the academic enterprise of the class. By this we mean that it is not reasonable to believe that any student would understand that his academic success, measured either by the degree of knowledge acquired or by the positive impression made on the instructor, turned on whether they abandoned all internal signals of peril to take a particular potentially hazardous route to

view fault lines. Put in the language of *Day*, the directive's tangential relationship to the field trip's academic mission leaves us with the firm conviction that it would not be reasonable for a student to rely on it. The instructor did not, therefore, exert the control which might be present in an academic setting to create a special relationship.

## CONCLUSION

¶ 28 Because the University's directive to Mr. Webb to traverse the sidewalk was insufficient to create a special relationship with him and a legal duty to him, we reverse the judgment of the court of appeals.

¶ 29 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.