**AMENDED OPINION\***

*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 65**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

KEVAN FRANCIS and REBECCA IVES, individually,
the natural parents of S.I., deceased,
*Plaintiffs and Appellants*,

*v.*

STATE OF UTAH, UTAH DIVISION OF WILDLIFE RESOURCES,
and JOHN DOES I–X,
*Defendants and Appellees.*

No. 20111027
Filed November 1, 2013

Fourth District, Provo Dep't
The Honorable David N. Mortensen
No. 080401029

Attorneys:

Allen K. Young, Tyler S. Young, Provo, Jonah Orlofsky, Chicago,
for appellants

John E. Swallow, Att'y Gen., Peggy E. Stone, Asst. Att'y Gen.,
Salt Lake City, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the court,
in which ASSOCIATE CHIEF JUSTICE NEHRING
and JUSTICE DURHAM concurred.

JUSTICE PARRISH filed a dissenting opinion,
in which JUSTICE LEE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1      This case is making its second appearance before this court.

---

\* The Court has rewritten the third sentence in paragraph 47.

Plaintiffs are the parents of a young boy, Sam Ives,[1] who was killed by a bear while camping with his family, the Mulveys,[2] in American Fork Canyon. They sued the State of Utah, alleging that the State negligently failed to warn the Mulveys of the dangerous condition created by the bear. The district court initially dismissed the plaintiffs' claims under the permit exception to the Utah Governmental Immunity Act (Immunity Act) and the plaintiffs appealed.[3] We reversed and held that the permit exception was inapplicable to the facts of this case.

¶2    On remand, the State raised two alternative arguments. First, the State argued that it owed no duty to the Mulveys. Second, the State argued that even if it did owe a duty, the natural condition exception to the Immunity Act precluded liability. After the district court dismissed the case a second time, the plaintiffs appealed and now raise three arguments. First, they assert that, under the law of the case doctrine, our refusal to entertain the State's alternative arguments in *Francis I* prevented the State from arguing those theories on remand. Second, they argue that the State did owe the Mulveys a duty of care. Finally, they contend that the natural condition exception to the Immunity Act does not apply.

¶3    The State counters that it was not barred from presenting its alternative arguments on remand. It reasons that we refused to consider those arguments in *Francis I* only because they had not been raised below and that our opinion actually contemplated that the State would be able to present its alternative arguments to the district court on remand. Second, the State argues that it owed no duty to the Mulveys because no special relationship existed. Finally,

---

[1] We typically use a minor's initials in our opinions. Due to the publicity surrounding this case, however, the plaintiffs used Sam's full name in their pleadings and received the district court's permission to use Sam's name in open court. We see no reason to change course.

[2] The plaintiffs are Kevan Francis and Rebecca Ives, Sam Ives's biological parents. Mr. Francis was not part of the camping party when Sam was killed. Rather, Sam was camping with his mother, her husband, Tim Mulvey, and their other children. We therefore refer to the individuals with whom Sam was camping as the "Mulveys" to distinguish the members of the camping party from the plaintiffs.

[3] *Francis v. State (Francis I)*, 2010 UT 62, 248 P.3d 44.

the State argues that because a bear is a natural condition, the State is immunized from liability under the natural condition exception to the Immunity Act.

¶4    We reverse the district court's grant of summary judgment in favor of the State. First, we hold that the State was entitled to present its alternative arguments on remand. Therefore, the issues of whether the State owed the Mulveys a duty and whether the natural condition exception applies are properly before this court. We further hold that (1) the State owed the Mulveys a duty because it undertook specific action to protect them as the next group to use the campsite, and (2) the natural condition exception does not immunize the State from liability because a bear is not a "natural condition on publicly owned or controlled lands."[4]

## BACKGROUND

¶5    For purposes of the State's motion for summary judgment and this appeal, "the parties d[o] not dispute the relevant facts, most of which [a]re taken from the related trial against the Federal government."[5]

¶6    On June 16, 2007, Jake Francom camped with his friends at an unimproved, dispersed campsite in the Uintah National Forest (Campsite). Unlike the improved Timpooneke Campground 1.2 miles away, the Campsite did not have water, a bathroom, or any other maintained facilities. It consisted of a ring of rocks for a fire, a flat area for tents, and room for a car to pull off the road. Despite the lack of improvements, it was a frequently used campsite, one of only a few on the dead-end Timpooneke Road. The only public access to the Campsite was through the Timpooneke Campground.

¶7    The U.S. Forest Service (NFS) was responsible for managing Timpooneke Campground, the Campsite, and Timpooneke Road. Pursuant to a Memorandum of Understanding between NFS and the Utah Division of Wildlife Resources (DWR), NFS "[r]ecognize[d DWR] as the agency with the authority, jurisdiction, and responsibility to manage, control, and regulate . . . wildlife populations on NFS lands."

¶8    At approximately 5:30 a.m. on the morning of June 17, 2007, while Mr. Francom and his friends slept in their tents, a black

---

[4] UTAH CODE § 63G-7-301(5)(k).

[5] *Francis v. United States*, No. 2:08CV244 DAK, 2011 WL 1667915 (D. Utah  May 3, 2011).

bear raided their coolers. The bear then struck Mr. Francom's head with its paw, and when Mr. Francom attempted to sit up, the bear pushed him back down. When Mr. Francom yelled to his friends, the group exited their tents and scared the bear away with pistol shots. Mr. Francom described the bear as a large, cinnamon-colored black bear. Such black bears are native to Utah.

¶9    Mr. Francom reported the bear attack to Utah County Dispatch at 9:25 a.m. that morning. The dispatcher told Mr. Francom that she would notify NFS but that Mr. Francom needed to call the Utah Highway Patrol, who would in turn notify DWR. Mr. Francom did so, and DWR was notified.

¶10   DWR's decision to track and destroy the bear was based on its internal policy entitled "Handling Black Bear Incidents" (Bear Policy). The Bear Policy is based on the premise that "[b]lack bear management in Utah attempts to balance the interest of wildlife, pubic use and public safety." DWR has a three-level classification system for nuisance bears. The highest classification, Level III, is for bears that have shown no fear of humans, have displayed aggressive behavior toward humans, and are deemed a threat to public safety. "Corrective action in these situations requires that the offending bear be destroyed." At approximately 10:00 a.m. on June 17, 2007, DWR classified the bear that attacked Mr. Francom as a Level III bear.

¶11   On the afternoon of the attack, two DWR agents, Dennis Southerland and Luke Osborn, responded to the incident and pursued the bear with dogs. They initiated the search at the Campsite and tracked the bear for approximately four to five hours, with no success. They ended the search at approximately 5:00 p.m. on June 17, 2007, but planned to return to the Campsite and set a trap the next morning. The DWR agents focused on the Campsite because the bear had found food there and would likely return if attracted. And they knew humans or food could act as an attractant for the bear. Therefore, just before leaving the area at approximately 5:00 p.m., they checked the Campsite to make sure it was unoccupied and clean of any attractants.

¶12   It is undisputed that DWR made no effort to warn anyone who might arrive at the Campsite after 5:00 p.m., nor did DWR warn the camp host at the nearby Timpooneke Campground. The NFS District Ranger for the area testified that a warning about the dangerous bear could have been placed on the gate at the head of Timpooneke Road, the gate could have been closed, or the Campsite could have been closed. But the DWR agents explained that no such

precautions were taken because it was already 5:00 p.m. on a Sunday, and they did not expect anyone to use the Campsite that evening.

¶13   As the DWR agents left the Campsite and traveled down the canyon on Timpooneke Road, they passed the Mulveys, who were traveling in the opposite direction. The DWR agents did not stop the Mulveys or warn them of the earlier attack but merely waved as they passed. The Mulveys "would not have camped in or anywhere near the area" and would have returned home had they known of the earlier attack.

¶14   After passing the DWR agents, the Mulveys proceeded down Timpooneke Road, set up at the Campsite, and cooked dinner. After dinner, they cleaned up the Campsite, put their coolers and garbage in their car, and went to bed in a single tent. Not all of the food made it into the car, however, and Sam brought a granola bar and a can of soda into the tent that evening. After the family had gone to sleep, a bear entered the Campsite, pulled Sam from the tent, and killed him. The bear was the same bear that had attacked Mr. Francom earlier that day.

¶15   Plaintiffs filed suit against the State, alleging that DWR's negligence led to the bear attack that caused Sam's death. After filing an answer and amended answer, the State filed a motion for judgment on the pleadings.[6] In its motion, as in its answer and amended answer, the State argued, among other things, that the permit exception to the Immunity Act, Utah Code section 63G-7-301(5)(c),[7] barred the plaintiffs' claims. On appeal, we reversed, holding that the Immunity Act's permit exception had "no bearing" on the plaintiffs' claims.[8]

¶16 We declined to address two alternative arguments presented by the State in *Francis I*: (1) that the State owed no duty of care to the Mulveys and (2) that the natural condition exception, section 63G-7-301(5)(k) of the Utah Code, immunized the State from

---

[6] *Francis I*, 2010 UT 62, ¶ 8, 248 P.3d 44.

[7] In accord with the district court's practice, we cite to the renumbered version of the statute at issue. No substantive changes were made when the statute was renumbered.

[8] *Id.* ¶ 9.

liability.[9] We "reject[ed] the State's two alternate arguments because they were not argued below and [were] not apparent on the record."[10]

¶17 On remand in the district court, the State filed a motion for summary judgment, raising the two alternative arguments that we declined to address in *Francis I*. The plaintiffs filed a motion to strike, arguing that these two legal theories were barred by the law of the case doctrine. The district court denied the plaintiffs' motion and allowed them to respond to the State's motion for summary judgment. Following oral argument, the district court granted the State's motion for summary judgment on both duty and immunity grounds and dismissed the plaintiffs' case. Plaintiffs timely appealed.

¶18 We have jurisdiction pursuant to section 78A-3-102(3)(j) of the Utah Code. We affirm the district court's denial of plaintiffs' motion to strike but reverse its grant of summary judgment for the State.

## STANDARD OF REVIEW

¶19 "Motions to strike pleadings or parts thereof are addressed to the judgment and discretion of the trial court. A ruling thereon, except under circumstances which amount to a clear abuse of discretion, will not be disturbed on appeal."[11] In contrast, we review a district court's grant of summary judgment for correctness, "considering only whether the trial court correctly applied the law and correctly concluded that no disputed issues of material fact existed."[12] Summary judgment is proper only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[13] Similarly, whether the district court accurately interpreted the Immunity Act is a legal question that we review for correctness.[14]

---

[9] *Id.*

[10] *Id.* ¶ 22 (internal quotation marks omitted).

[11] *Pratt v. Nelson*, 2005 UT App 541, ¶ 9, 127 P.3d 1256 (internal quotation marks omitted).

[12] *Hermansen v. Tasulis*, 2002 UT 52, ¶ 10, 48 P.3d 235.

[13] UTAH R. CIV. P. 56(c).

[14] *Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 5, 173 P.3d 166.

## ANALYSIS

### I. OUR REFUSAL TO REACH THE STATE'S TWO ALTERNATIVE THEORIES FOR DISMISSAL IN *FRANCIS I* DID NOT PRECLUDE THE STATE FROM RAISING THEM ON REMAND

¶20   In its briefs to us in *Francis I*, the State presented two alternative theories to support the dismissal of the plaintiffs' claims. We declined to entertain those theories because the State had not argued either of them below and the district court had not been given an opportunity to rule on them. Our ruling did not, however, preclude the State from raising those arguments in the district court on remand.

¶21   "[A] decision of an appellate court constitutes the law of the case only as to such questions of law as were involved in the judgment, and as were presented to the court and expressly or impliedly decided."[15] In *Francis I*, we did not expressly or impliedly decide the merits of the State's duty or natural condition exception defenses. Rather, we ruled only that we would not consider those arguments because the State had not presented the defenses below and the district court had not yet ruled on their merits. But our ruling in no way prevented the State from raising those defenses on remand.

¶22   That is exactly what the State elected to do. On remand, the State raised its duty and natural condition exception defenses as part of a motion for summary judgment. The district court found the defenses meritorious and granted the State's motion. Because our ruling in *Francis I* in no way foreclosed the State's ability to argue duty or the natural condition exception before the district court, the district court did not err in ruling on the merits of those arguments.

---

[15] *Herriman Irrigation Co. v. Keel*, 69 P. 719, 721 (Utah 1902); *see also Thurston v. Box Elder Cnty.*, 892 P.2d 1034, 1037 (Utah 1995) ("The [law of the case] doctrine was developed in the interest of economy and efficiency to avoid the delays and difficulties involved in repetitious contentions and reconsideration of rulings on matters previously decided in the same case.").

## II. THE STATE'S PROTECTIVE ACTIONS, DIRECTED AT THE CAMPSITE, GAVE RISE TO A DUTY OF CARE TO THE MULVEYS AS THE NEXT OCCUPANTS OF THE CAMPSITE

¶23   We next turn to the merits of the State's alternative defenses. We "consider whether there is a legal theory upon which suit can be brought . . . before considering the separate and independent questions of whether the [government] is immune."[16] Therefore, before considering whether the natural condition exception applies, we consider whether the State owed the Mulveys a duty of care.

¶24   Plaintiffs assert that the State owed them a duty because (1) it took specific action to protect the Mulveys as potential users of the Campsite; (2) it failed to follow its internal Bear Policy; or (3) it had assumed the obligations of a landowner. We agree with the Plaintiffs' first argument and conclude that the State's actions, specifically directed at the Campsite, gave rise to a special relationship between the State and the Mulveys.

¶25   To establish a claim of negligence, a plaintiff must first show "that the defendant owed the plaintiff a duty."[17] This showing is more complicated when the government is the defendant. Under the public duty doctrine, the general duty that the government owes to the public does not give rise to a specific duty of care to individuals "unless there is some [special relationship] between the government agency and the individuals that makes it reasonable to impose a duty."[18]

¶26   We have always "taken a policy-based approach in determining whether a special relation should be said to exist and consequently whether a duty is owed."[19] We carefully consider "the consequences of imposing that duty for the parties and for society."[20] And "[w]e are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the

---

[16] *Rollins v. Petersen*, 813 P.2d 1156, 1162 n.3 (Utah 1991).

[17] *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 9, 125 P.3d 906 (internal quotation marks omitted).

[18] *Day v. State*, 1999 UT 46, ¶ 12, 980 P.2d 1171.

[19] *Higgins v. Salt Lake Cnty.*, 855 P.2d 231, 236 (Utah 1993).

[20] *Id.* at 237.

parties' relationship."[21] Our determination that a special relationship exists, therefore, "is an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff [was] entitled to protection."[22]

¶27 Our cases provide at least four circumstances that can give rise to a special relationship:

> (1) by a statute intended to protect a specific class of persons of which the plaintiff is a member from a particular type of harm; (2) when a government agent undertakes specific action to protect a person or property; (3) by governmental actions that reasonably induce detrimental reliance by a member of the public; and (4) under certain circumstances, when the agency has actual custody of the plaintiff or of a third person who causes harm to the plaintiff.[23]

The second circumstance is relevant to the facts of this case. It presents a two-part question: first, whether the State undertook specific action and, second, whether those actions were intended to protect a person or property.

¶28 In analyzing the first question, it is important to note that the term "special relationship" can have different meanings depending on the context.[24] In the context of ordinary negligence, "a special relationship is what is required to give rise to a duty to act, whereas the existence of a special relationship relating to a governmental actor can result in the imposition of liability for either her acts or her failure to act."[25] Thus, "[a] governmental actor can create a special relationship, where one did not previously exist, by her acts."[26]

¶29 The parties in this case do not dispute that the government took specific actions after the bear attacked Mr. Francom at the Campsite. Indeed, after giving up the search for the bear at approximately 5:00 p.m. on the day of the attack, DWR agents swept

---

[21] *Id.*

[22] *Webb*, 2005 UT 80, ¶ 9 (internal quotation marks omitted).

[23] *Id.* ¶ 25 (internal quotation marks omitted) (citing cases).

[24] *Id.* ¶ 13.

[25] *Id.*

[26] *Id.* ¶ 14.

the Campsite to make sure it was unoccupied and free of anything that might induce the bear to return.

¶30 But acts alone are insufficient to create a special relationship. "[T]he professional lives of governmental actors are comprised of an unending sequence of actions and failures to act that in many instances can directly affect the health, safety, and general well-being of citizens."[27] We do not hold governmental actors liable "for all mishaps that may befall the public."[28] We must therefore turn to the second question—whether the State's actions were intended to protect a person or property.

¶31 We have determined as a matter of public policy "that governmental actors should be answerable in tort when their negligent conduct causes injury to persons who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor."[29] The State contends that the Mulveys did not "stand apart" from the public because they were not specifically identifiable when the State cleared the Campsite. We disagree that a lack of knowledge as to the specific identity of an individual necessarily precludes a special relationship under the public duty doctrine in all cases.

¶32 We draw support for this conclusion from our decision in *Higgins v. Salt Lake County*. In that case, we discussed the standard for establishing a special relationship "in the context of an action against [a] state hospital for harm caused to a member of the public by an escaped patient."[30] We stated that "it must be shown that the custodian knew or should have known that unless steps were taken to protect others from the detainee, he or she was likely to cause bodily harm to persons who were reasonably identifiable by the custodian either individually or as members of a distinct group."[31] We recognized "that when the theoretical danger of the one in custody became sufficiently crystalized that it took on a specific object and means, it became reasonable to impose a duty" because "the identification of a victim and a means has made it feasible for

---

[27] *Id.* ¶ 11.

[28] *Id.*

[29] *Id.*

[30] *Higgins*, 855 P.2d at 238; *accord Rollins*, 813 P.2d at 1162.

[31] *Higgins*, 855 P.2d at 238 (internal quotation marks omitted).

the custodian to take concrete steps to prevent the harm."[32] *Higgins* demonstrates that "we will find a special relationship and consequent duty when a defendant knew of the likely danger to an individual or distinct group of individuals."[33] Under *Higgins*, then, it is not necessary that an individual be specifically identifiable if he or she belongs to a distinct group.

¶33    *Higgins*, of course, is not directly on point. The State did not have custody of the bear in the same way it might have custody of a psychiatric patient. But this distinction carries little weight given that, as discussed above, the State undertook specific protective actions after the bear attacked Mr. Francom. It thus had knowledge of a specific threat and took action.[34] If it directed its actions at a distinct group, rather than the public at large, our reasoning in *Higgins* appears directly applicable. And we conclude that the State did, in fact, direct its actions at an identifiable group.

¶34    While the bear was certainly a threat to the public at large, the State's actions demonstrate that the bear posed a particular danger to a more distinct group—those who would occupy the Campsite before the bear was destroyed. After giving up their search for the bear, the DWR agents took specific steps to protect those who might occupy the Campsite. They did so because they knew the bear

---

[32] *Id.*

[33] *Id.* at 240.

[34] These facts render the U.S. district court's decision in *Gadd ex rel. Gadd v. United States*, 971 F. Supp. 502 (D. Utah 1997), unpersuasive. The State relied on *Gadd* in its briefing "as the most factually similar case" to the facts here. In *Gadd*, a bear attacked a young girl while she was camping in Utah with her family. *Id.* at 504. The plaintiffs sued both the federal and state government for negligence. *Id.* at 505. As to the state, the court concluded that it did not have a special relationship or a consequent duty to the plaintiffs. *Id.* at 511. But unlike the facts here, there was "no evidence [in *Gadd*] that the DWR undertook to render any specific service to plaintiffs or to other campers." *Id.* And, importantly, the court recognized that "because the State had no knowledge or control of the bear when it entered [the campground and attacked the girl], it could not have reasonably identified plaintiffs as likely to be harmed any more than the general public." *Id.* Here, the State clearly had knowledge and had already taken action directed at the Campsite by the time the bear attacked Sam.

would likely return to the Campsite if attracted and that humans could act as an attractant. Accordingly, just before leaving the area, the DWR agents swept the Campsite to make sure it was unoccupied and clean of attractants. Thus, the State had knowledge of a specific threat to a distinct group and took specific action to protect that group. The State therefore had a special relationship with those who might occupy the Campsite—here, the Mulveys—even if they were not individually identifiable when the State cleared the Campsite.

¶35    Additionally, the Mulveys themselves were "reasonably identifiable" as the next group to use the Campsite. The DWR agents who swept the Campsite waved to them as they drove down Timpooneke Road in the direction of the Campsite. The Campsite was only one of a few on the dead-end Timpooneke Road. So although DWR could not specifically identify the Mulveys when its agents swept the Campsite, it nevertheless had reason to believe that the Mulveys could use the Campsite and could therefore be at risk.

¶36    Finally, we note that, like in *Higgins*, it is reasonable as a matter of public policy to impose a duty on the State because it was "feasible for the [State] to take concrete steps to prevent the harm."[35] After the bear attacked Mr. Francom, the threat the bear posed was no longer theoretical. The DWR agents knew that the Campsite was the best place to apprehend the bear because bears frequently return to locations where they have previously found food. They also knew that humans can act as bear attractants. The risk of another bear attack for those who might occupy the Campsite had thus "crystalized."[36] Accordingly, imposing a duty here is not "realistically incapable of performance [n]or fundamentally at odds with the nature of the parties' relationship."[37]

¶37    Further, finding a special relationship under these facts does not threaten to subject the State to a general negligence scheme.[38] We conclude only that the State owed a duty to the Mulveys as the next group to use the Campsite—the group that DWR took specific action to protect. The class of people with which the State had a special relationship is, therefore, very narrow.

---

[35] 855 P.2d at 238.

[36] *Id.*

[37] *Id.* at 237.

[38] *See id.* at 236.

¶38    Based on the foregoing, we hold that the district court erred when it granted summary judgment on the basis that the State owed no duty to the Mulveys. We next consider whether the State is immune from liability under the Immunity Act.

### III. WE CONCLUDE THAT THE BEAR WAS NOT A NATURAL CONDITION ON THE LAND AND, AS A RESULT, THAT THE STATE IS NOT IMMUNE FROM LIABILITY UNDER THE IMMUNITY ACT

¶39    The State alternatively asserts that it is immune from liability under the natural condition exception to the Immunity Act. Plaintiffs counter that the exception does not apply because "wildlife is not a condition [on] land."[39] "[T]o determine whether a governmental entity is immune from suit under the Act, we apply a three-part test, which assesses (1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver."[40] Since the parties do not contest the first two prongs of the test, we focus our analysis only on the applicability of the natural condition exception.

¶40    Utah Code section 63G-7-301(5)(k) immunizes the State from liability in those instances where the plaintiffs' injury "arises out of, in connection with, or results from . . . any natural condition on publicly owned or controlled lands." The State argues that Utah's native black bears are such a natural condition and that the State is therefore immune from liability. Plaintiffs counter that a bear is not a natural condition as contemplated by the statute. We agree with Plaintiffs and conclude that a bear is not a "natural condition on publicly owned or controlled lands."

¶41    Whether indigenous wildlife is a "natural condition" on public land is an issue of statutory interpretation. "When interpreting a statute, our goal is to give effect to the legislature's

---

[39] Alternatively, plaintiffs argue that even if wildlife is a natural condition, the second bear attack was not "natural" because DWR's decision to allow campers at the Campsite created an "artificial lure to bring the bear back." Since we conclude that wild animals are not a natural condition on the land, we decline to address this argument.

[40] *Blackner v. Dep't of Transp.*, 2002 UT 44, ¶ 10, 48 P.3d 949.

intent and purpose."[41] To determine legislative intent, "we begin with the statute's plain language."[42] And "[w]hen discerning the plain meaning of the statute, terms that are used in common, daily, nontechnical speech, should, in the absence of evidence of a contrary intent, be given the meaning which they have for laymen in such daily usage."[43]

¶42 Based on these principles of statutory interpretation, we construe the term "natural condition" in light of its ordinary meaning, as laymen would use it in daily usage. In our view, one would not ordinarily refer to a bear, or wildlife generally, as a "condition" on the land. The more ordinary meaning of a "condition on the land" seems to connote features that have a much closer tie to the land itself, such as rivers, lakes, or trees. These conditions are more directly a part of and persist "on the land," whereas a bear is much more transitory in nature. We accordingly limit application of the natural condition exception to those conditions that are closely tied to the land or that persist "on the land"—conditions that are topographical in nature.[44]

---

[41] *Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 9, 173 P.3d 166.

[42] *Id.*

[43] *O'Dea v. Olea*, 2009 UT 46, ¶ 32, 217 P.3d 704 (internal quotation marks omitted).

[44] The dissent criticizes our decision in this case as "lack[ing] both explanation and textual analysis." *Infra* ¶ 51. We agree with the dissent, however, that whether a bear "exist[s] 'on' the land is not at issue in this case." *Infra* ¶ 57. We also concede that a bear is "naturally-occurring," *infra* ¶ 55, and "in physical contact with" and "supported by" the land, *infra* ¶ 57. But that is not enough. The bear must also be a "condition" to fall within the scope of the natural condition exception. UTAH CODE § 63G-7-301(5)(k). And as to this issue, our analysis is nearly identical to the dissent's. Both amount, essentially, to a claim that a hypothetical ordinary person would, or would not, refer to wildlife as a "condition" on the land. *Infra* ¶¶ 54–55.

We maintain that an ordinary person would typically not refer to a bear as a "condition." It seems to us that if we were to ask a hypothetical ordinary person to describe a bear, that person would call it an "animal" or "wildlife," whereas a "condition" would be well down the list of potential responses. The dissent appears to

(continued...)

¶43 This interpretation is consistent with our previous decisions applying the natural condition exception. Most recently, in *Grappendorf v. Pleasant Grove City*, we undertook a "careful analysis" of the natural condition exception.[45] We defined "natural" to mean "[p]resent in or produced by nature."[46] We then recognized that "[t]he word natural modifies 'condition,' which is generally understood as a '[m]ode or state of being.'"[47] We stated that, in context of the phrase "on publicly owned or controlled lands," the use of the word "on" means a "[p]osition above and in contact with or [c]ontact with a surface, regardless of position."[48] Finally, we concluded that "[f]rom these definitions, it follows that a natural condition 'on' the land must be *topographical in nature*."[49] Based on

---

[44](...continued)
acknowledge this. *See infra* ¶ 53 (stating that "I would agree that one does not normally refer to a particular animal as a natural condition on the land" (internal quotation marks omitted)). But the dissent nevertheless concludes that "indigenous wildlife" is both "abundant" and "as much a part of the natural condition of land as are the rivers, lakes, or trees." *Infra* ¶¶ 53–54. Both of these assertions are, of course, true. But we disagree that they are persuasive evidence that the legislature considered a bear to be a "condition."

Indeed, the fact that wildlife is so abundant in Utah suggests the opposite intent. It seems odd that the legislature would seek to include something so abundant and significant as wildlife in its retention of immunity by using the term "condition," which at best requires a strained interpretation to encompass wildlife. We therefore decline to reach that conclusion.

[45] 2007 UT 84, ¶¶ 9–10.

[46] *Id.* ¶ 10 (alteration in original) (internal quotation marks omitted).

[47] *Id.* (second alteration in original).

[48] *Id.* (alterations in original) (internal quotation marks omitted).

[49] *Id.* (emphasis added). The dissent contends that our decision in *Grappendorf* was never intended to limit the natural condition exception to topographical features. *Infra* ¶ 56. We agree that the narrow holding of *Grappendorf* was that a gust of wind is not a natural condition on land, but a fair reading of that decision supports our conclusion to limit the scope of the exception to topographical features. The relevant sentence in *Grappendorf* does not

(continued...)

this plain-language analysis, we concluded that a "gust of wind . . . does not fall under the natural condition exception."[50]

¶44   We noted in *Grappendorf* that our decision to exclude a gust of wind from the natural condition exception was consistent with our other decisions applying the natural condition exception.[51] In *Stuckman ex rel. Nelson v. Salt Lake City*, we suggested that a river would qualify as a natural condition on the land.[52] Later, in *Blackner v. Department of Transportation*, we concluded that avalanches, and the snowpack from which they originate, are also natural conditions on the land.[53] These opinions collectively demonstrate that, to be a

---

[49](...continued)
merely "suggest" that a natural condition must be topographical, *infra* ¶ 56, it plainly states it. And although that statement is limited to one sentence, *infra* ¶ 56, it was by no means a throw-away sentence. It was, in fact, the culmination of our plain-language analysis of the natural condition exception. *See Grappendorf*, 2007 UT 84, ¶ 10 (analyzing dictionary definitions and stating that, "[f]rom these definitions, it follows that a natural condition 'on' the land must be topographical in nature").

But even assuming that our decision in *Grappendorf* "sought only to distinguish natural atmospheric conditions like the gust of wind at issue in that case from those natural conditions that exist on the land," *infra* ¶ 56 (internal quotation marks omitted), it is telling that we seized on topography as the most obvious example to distinguish. We did not, for example, compare a gust of wind to wildlife. This is most likely because, as we have argued here, wildlife does not generally come to mind when discussing "conditions" on land. And if topographical features are what generally come to mind as natural conditions on land, it seems reasonable to conclude that the legislature also had such features in mind when drafting the natural condition exception, not wildlife.

[50] *Grappendorf*, 2007 UT 84, ¶ 10.

[51] *Id.* ¶ 14.

[52] *See* 919 P.2d 568, 574–75 (Utah 1996) (comparing a river to a fence and suggesting that the river is a natural condition).

[53] 2002 UT 44, ¶ 14, 48 P.3d 949. The dissent argues that our holding in this case conflicts with *Blackner* because an avalanche itself is not topographical. *Infra* ¶ 58. There are certainly differences between an avalanche and, say, a tree. In our opinion, however, an

(continued...)

natural condition on the land, the condition must be topographical in nature, like the river in *Nelson* and the snowpack and avalanche in *Blackner*. We accordingly exclude wildlife from the natural condition exception because wildlife—like a gust of wind—is not topographical in nature.

¶45 There are, of course, differences between a gust of wind and wildlife. And we readily acknowledge that wildlife could plausibly fall within the scope of the natural condition exception. But we must exercise caution when interpreting an inexact term like "condition," since its meaning could be stretched to include almost anything. As we stated in *Grappendorf*, "natural conditions include laws of physics, such as gravity, that necessarily contribute to any accident or occurrence."[54] Our duty when interpreting a statute, however, is "to give effect to the legislature's intent and purpose."[55] And, in our view, the legislature did not intend to waive immunity for a gust of wind but retain it for indigenous wildlife when both seem to fall outside the ordinary meaning of a "condition on land."

¶46 This is especially true given that the legislature could easily have stated expressly that the State retains immunity for injuries arising from indigenous wildlife. While the legislature cannot anticipate every incident that may occur in our state's vast public lands, it seems particularly obvious that injury will arise from the public's inevitable confrontations with wildlife. Given this obvious risk, it seems somewhat unlikely that the legislature would use the term "natural condition" to retain immunity from injuries arising

---

[53](...continued)

avalanche is sufficiently topographical in nature. It is inextricably tied to the land and the snowpack from which it originates. It affects the shape and contours of the topography, even if temporarily.

In any event, interpreting and applying an inexact term such as "condition" is an imprecise exercise in line-drawing. We admit that our case law could be clearer. But in our view, *Grappendorf* provides a consistent way to reconcile our past treatment of the natural condition exception. It is both reasonable and logical to draw a line between things that are topographical in nature, such as rivers, cliffs, trees, or avalanches, and things that are not, such as a gust of wind or bears.

[54] 2007 UT 84, ¶ 11.

[55] *Id.* ¶ 9.

out of or in connection with bears or other wildlife.[56]

¶47 Finally, we note that our interpretation is also supported by the structure of the Immunity Act. A fundamental rule of statutory construction provides that "[w]here a general provision in a statute has certain limited exceptions, all doubts should be resolved in favor of the general provision rather than the exceptions."[57] The Immunity Act sets forth a number of broad waivers of immunity, including waiver "as to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment."[58] It then reinstates immunity through specific, enumerated exceptions to the broad waivers of immunity.[59] Thus, we resolve any doubt as to whether the legislature intended one of the exceptions—the natural condition exception—to cover wildlife in favor of the Immunity Act's general waiver of immunity.[60]

---

[56] The legislature is of course not "obligated to explicitly list each specific element of nature . . . that falls within the exception." *Infra* ¶ 60. But as we have said throughout this opinion, *supra* ¶¶ 41, 45, our task is to determine legislative intent. We simply recognize here that where there is a particularly broad and obvious category of risk, such as wildlife, it most likely was not the legislature's intent to retain immunity for that risk by using language that most people would not typically use to describe it.

[57] *Nini v. Mercer Cnty. Cmty. Coll.*, 995 A.2d 1094, 1100 (N.J. 2010) (internal quotation marks omitted); *see also State v. Lutters*, 853 A.2d 434, 444 (Conn. 2004); *Menke Hardware, Inc. v. City of Carroll*, 474 N.W.2d 579, 580 (Iowa 1991); *State v. Wright*, 529 P.2d 453, 458 (Wash. 1974).

[58] *See* UTAH CODE § 63G-7-301(1)–(3), (4).

[59] *See id.* § 63G-7-301(5).

[60] The dissent appears to recognize some room to disagree as to the meaning of "condition" within common parlance. *Infra* ¶ 53. We agree that the term is imprecise and potentially ambiguous. We accordingly employ the rule of statutory construction discussed above to resolve any such ambiguity in favor of the general waiver of immunity rather than the narrow natural condition exception. The dissent has declined to comment on this portion of our analysis, however, opting instead to rely on cases from other jurisdictions. *Infra* ¶ 59. While cases from outside Utah can often be persuasive,

(continued...)

JUSTICE PARRISH, dissenting

¶48 For these reasons, we hold that wildlife like the bear at issue in this case is not a "natural condition on the land" under Utah Code section 63G-7-301(5)(k). We therefore conclude that the district court erred when it granted summary judgment for the State on the basis of natural condition immunity.

**CONCLUSION**

¶49 The district court erred in granting the State's motion for summary judgment in this case. We conclude that, although the plaintiffs' law of the case argument is inapplicable because there was nothing in *Francis I* that prevented the State from raising its alternative arguments on remand, the district court nevertheless erred in concluding that the State did not owe a duty to the Mulveys and that the natural condition exception applied. We therefore reverse and remand for proceedings consistent with this opinion.

JUSTICE PARRISH, dissenting:

¶50 Though I join in part I of the majority opinion, I respectfully dissent from part III, and would therefore not reach the issue discussed in part II. Under the plain language of the statute, I conclude that the presence of indigenous wildlife is a "natural condition on publicly owned or controlled lands" and that the State is therefore entitled to immunity. UTAH CODE § 63G-7-301(5)(k). Because I would hold that the State is immune from liability under the natural condition exception, I would not reach the issue of whether the State owed any duty to the Mulveys.

## I. THE PRESENCE OF INDIGENOUS WILDLIFE IS A NATURAL CONDITION ON THE LAND

¶51 The majority correctly states that issues of statutory construction must begin with an analysis of the statutory language. *Supra* ¶ 41. But its conclusion that a layman would not consider the presence of indigenous wildlife to constitute a natural condition on the land lacks both explanation and textual analysis. Indeed, a textual analysis suggests the contrary conclusion.

¶52 We analyzed the meaning of the phrase "natural condition on the land" most recently in *Grappendorf v. Pleasant Grove City*, where we stated:

---

[60](...continued)
we conclude in this case that they are inconsistent with the legislature's intent and therefore decline to follow them.

> "Natural" is defined as "[p]resent in or produced by nature." WEBSTER'S II NEW COLLEGE DICTIONARY 729 (1995). The word natural modifies "condition," which is generally understood as a "[m]ode or state of being." *Id.* at 234. Natural condition is then limited by the prepositional phrase "on publicly owned or controlled lands." In this context, "on" is "[u]sed to indicate . . . [a] [p]osition above and in contact with" or "[c]ontact with a surface, regardless of position." *Id.* at 764.

2007 UT 84, ¶ 10, 173 P.3d 166 (alterations in original).

¶53 The phrase "natural condition" therefore refers to a mode or state of being present in or produced by nature. And any such "natural condition" must be in contact with the land. This plain language definition easily encompasses indigenous wildlife such as the bear that attacked Sam. While I would agree that one does not normally refer to a particular animal as a "natural condition on the land," the presence of indigenous wildlife generally is as much a part of the natural condition of land as are the rivers, lakes, or trees cited by the majority.

¶54 If one were asked to describe the natural condition of the land that now constitutes the state of Utah, the presence of native wildlife would necessarily be part of such a description. The land would likely be described as a varied landscape, complete with mountains, valleys, deserts, forests, rivers, and lakes. But it would also be described as a land replete with abundant wildlife. Long before the borders of Utah were drawn, the land, in its natural condition, contained large and small indigenous wildlife in addition to its topographical features. And today, conservation efforts aimed at preserving the natural condition of Utah's public lands include support for and rehabilitation of native species. To read "natural condition" in the limited context of topographical features ignores an entire segment of the unique natural condition of Utah's public lands.

¶55 When one compares the natural condition of the land within Utah to that of other states, the presence of native wildlife is necessarily part of the comparison. A component of the natural condition of the land in Utah is the presence of deer, elk, moose, and black bears. The natural condition of the land underlying Kansas or New Jersey or Florida does not necessarily include the presence of such indigenous wildlife. And it is in part this particular natural

condition of Utah—our abundant native wildlife populations—that draws visitors to certain parts of the state, such as Antelope Island or American Fork Canyon. Similarly, people are drawn to Yellowstone National Park not only for the topographical natural conditions such as Old Faithful, but also for the naturally-occurring herds of bison and elk, wolves, eagles, and other native creatures that have always been part and parcel of the landscape there.

¶56 The majority next looks to case law to support its conclusion that the presence of indigenous wildlife is not a natural condition on the land. Specifically, it cites to our opinion in *Grappendorf* as support for its conclusion that natural conditions must be topographical in nature. *Supra* ¶ 43. While one sentence in *Grappendorf* suggests that a natural condition "on the land" must be topographical, it did not hold that only topographical features can constitute natural conditions. Rather, the discussion of topography in *Grappendorf* arose in connection with the statutory requirement that the "natural condition" must exist "on" the land. 2007 UT 84, ¶ 10. In discussing topography, we sought only to distinguish natural atmospheric conditions like the gust of wind at issue in that case from those natural conditions that exist "'on' the land." *Id.* ¶ 10. We reasoned that the language of the Immunity Act "requires that the natural condition be in physical contact with the land, supported by the surface of the land, or [a] part of the land." *Id.* In summary, there is nothing in *Grappendorf* to suggest that only a topographical feature can qualify as a "natural condition."

¶57 But the requirement that the natural condition exist "on" the land is not at issue in this case. While indigenous wildlife is not "topographical in nature," it is indisputably in "physical contact with the land, [and] supported by the surface of the land," both literally and ecologically. *Id.* ¶ 10. Because indigenous wildlife is both "in physical contact with" and "supported by" the land, it falls within the plain language of the natural condition exception to the Immunity Act.

¶58 The majority also cites to our opinion in *Blackner v. Department of Transportation*. There, we held that avalanches fall within the scope of the natural condition exception even though, by their nature, they are both transient and evanescent. 2002 UT 44, ¶¶ 13, 16, 48 P.3d 949. I find the majority's holding that the natural condition exception is limited to topographical features to be irreconcilable with our holding in *Blackner*. Although avalanches originate from and travel on topographical features of the land, an avalanche itself is not topographical. While the path of an avalanche

may be traced on a map, its limited existence means that such efforts will not endure when the weather or the season changes. In this way, an avalanche shares little with enduring topographical features such as rivers or cliffs, but is more akin to indigenous wildlife. Where we have held that an avalanche, temporary and ephemeral as it is, constitutes a "natural condition on the land," native species that have been supported for hundreds, if not thousands, of years "on" the land must also fall within the ambit of the natural condition exception.

¶59 The conclusion that indigenous wildlife is a natural condition on the land is also consistent with the holdings of other courts facing the question. Most recently, the Montana Supreme Court held that "[g]rizzly bears are wild animals existing upon the property, and, as such, are a 'condition of the property' for purposes of Montana's Recreational Use Immunity Act." *Hilston v. State (In re Estate of Hilston)*, 2007 MT 124, ¶ 17, 160 P.3d 507. It recognized that indigenous wild animals are "of a wild nature or disposition," and exist on the land free from the dominion or control of anyone, including the State. *Id.* ¶ 15 (quoting BLACK'S LAW DICTIONARY, 635 (7th ed. 1999)); *see also Palumbo v. State*, 487 So.2d 352, 353 (Fl. 1986) (recognizing that the State was under no obligation to protect against native alligators because they were not in the State's custody nor were a non-native species introduced by the State). The *Hilston* court's analysis paralleled that of the California Court of Appeal's decision in *Arroyo v. State*, 34 Cal. App. 4th 755, 759 (1995), in which the court was asked to interpret a statute protecting government entities from liability for injuries caused by natural conditions. Though the plaintiffs in *Arroyo* argued "that only physical conditions of land" should be classed as natural conditions, the court held that "wild animals are a natural part of the condition of unimproved public property." *Id.* at 761–62. The court concluded that it would be impracticable for the State to protect against every danger occasioned by the public's use of unimproved State land, and that the Legislature intended the term "natural condition" to be construed broadly. *Id.*

¶60 Finally, the majority suggests that if the Legislature intended to include indigenous wildlife in the natural condition exception, it could have, and should have, specifically listed wildlife under the exception. *Supra* ¶ 46. But the majority "readily acknowledge[s] that wildlife could plausibly fall within the scope of the natural condition exception." *Id.* And the majority takes no issue with applying the natural condition exception to rivers,

avalanches, and cliffs even where the statute encompasses all "natural condition[s]" and does not limit its application solely to topographical features. In so doing, the majority unnecessarily circumscribes the Legislature's purpose by suggesting that the Legislature is obligated to explicitly list each specific element of nature (i.e., river, lake, avalanche, cliff) that falls within the exception. Because I believe that the inclusive term "natural condition" is broad enough to encompass the presence of native wildlife, including the black bear at issue here, I respectfully dissent.

## CONCLUSION

¶61 Because the presence of indigenous wildlife on Utah's public lands is a "natural condition" of those lands, I would hold that the State is immune from liability for Sam's death under the natural condition exception to the Immunity Act. I would therefore not reach the issue of any duty the State owed to the Mulveys.

¶62 The natural condition exception serves a valuable purpose in our state. "The necessity for this exception arises because Utah's vast public lands . . . are open to the public [and] present all kinds of hazards arising from their natural conditions. . . . The State and other governmental entities cannot be expected to [protect citizens against] every . . . potentially hazardous condition located on public property." *Grappendorf v. Pleasant Grove City*, 2007 UT 84, ¶ 8, 173 P.3d 166 (alterations in original) (internal quotations marks omitted). And injury caused by native wildlife is one of the many foreseeable risks that users may encounter in Utah's unimproved wilderness. To burden the State with liability for injuries arising from the foreseeable dangers occasioned by the presence of native wildlife may very well result in significant restrictions or even prohibitions on the public's use of such lands. The natural condition exception thus requires that those who voluntarily use unimproved public land assume some of the related risks as part of the price paid for the benefits of its use.